# TELEVISION VIDEOTAPE AGREEMENT

## January 27, 2013 – February 2, 2016



**Raymond M. Hair Jr., International President**
**American Federation of Musicians**
**of the United States and Canada**
**1501 Broadway, Suite 600,**
**New York, New York 10036**
**www.afm.org**

# TABLE OF CONTENTS

1.   Scope of Agreement ...................................................................................1
2.   Union Recognition .....................................................................................1
3.   Union Security............................................................................................1
4.   Use of Live Music......................................................................................2
5.   Sound Track Regulations ..........................................................................2
6.   Wages .........................................................................................................4
7.   Pension Welfare Funds...............................................................................4
8.   Reuse ..........................................................................................................4
9.   Foreign Use .................................................................................................6
10.  Audition Programs .....................................................................................9
11.  Copies and Lists .........................................................................................9
12.  Action Requiring Union Approval ...........................................................10
13.  Supplemental Markets ..............................................................................11
14.  More Favorable Terms..............................................................................15
15.  Access to the Studio .................................................................................16
16.  Health and Safety......................................................................................16
17.  No Discrimination.....................................................................................16
18.  Industry–Federation Committee...............................................................16

EXHIBIT I:      MINIMUM WAGES & OTHER WORKING CONDITIONS
                (RECORDING INSTRUMENTALISTS, LEADERS, CONTRACTORS)

A.   Basic Rates................................................................................................17
B.   Contractor .................................................................................................21
C.   Doubling ...................................................................................................22
D.   Cartage......................................................................................................23
E.   Health and Welfare Fund Contribution ...................................................23
F.   Multiple Parts ...........................................................................................24
G.   Premium Pay .............................................................................................24
H.   Meal Periods .............................................................................................24
I.   Rest Period ................................................................................................24
J.   Use of Pre-Recordings and Phonograph Records at Rehearsals............25
K.   Make-Up and Costuming .........................................................................25
L.   Advance Notice of Rehearsal ..................................................................26
M.   Cancellation of Engagements...................................................................26
N.   Bank Acts .................................................................................................26
O.   Run of Show Guarantee ...........................................................................27
P.   Late Payment Penalties ............................................................................27
Q.   Scoring for Daytime Serials and Strip Game Shows ..............................28
R.   Scoring for Non-Musical Game Shows (Includes Strip Game Shows) ...................29

**S.**   **Theme Music** ................................................................................**29**
**T.**   **Splitting of Orchestra** ..................................................................**30**
**U.**   **Music Sound Consultant** ..............................................................**30**
**V.**   **Electronic Musical Instruments** ....................................................**31**
**W.**   **Use of Music in News and Magazine Programs** ..............................**31**
**X.**   **Incomplete Tracks** ......................................................................**32**
**Y.**   **Travel** ........................................................................................**32**

**EXHIBIT II:**   **BASIC RATES FOR PRODUCTION MUSICIANS**

**A.**   **Hourly Employment** ....................................................................**33**
**B.**   **Production Musicians** ..................................................................**33**

**EXHIBIT III:   MUSIC PREPARATION SERVICES**

**A.**   **Arrangers** ..................................................................................**34**
**B.**   **Orchestrators** ............................................................................**34**
**C.**   **Copyists** ....................................................................................**36**
**D.**   **Librarians** ..................................................................................**39**
**E.**   **General Rules Applicable to Arrangers, Orchestrators and Copyists** ....................**39**

**EXHIBIT A:**   **RE: FILM MUSICIANS SECONDARY MARKETS FUND AGREEMENT** .........**41**

**EXHIBIT A-1: THEATRICAL AND TELEVISION MOTION PICTURE**
  **FILM MUSICIANS SECONDARY MARKETS FUND AGREEMENT** ...............**42**

**SIDE LETTERS**

**Re:**   **Miscellaneous Modifications of Agreement** ..........................................**48**
**Re:**   **Implementation of Article 12** ..........................................................**48**
**Re:**   **Exhibit I** ....................................................................................**49**
**Re:**   **Application of Articles 8 and 9 to Daytime Serials Scoring** ....................**49**
**Re:**   **Application of Article 13 to Music Scored for Daytime Serials** ..............**49**
**Re:**   **Application of Article 13 to Theme Music Production** ..........................**50**
**Re:**   **"Distributor's Gross" Computations** ................................................**50**
**Re:**   **Computations under Most Favored Nations Agreement** ........................**50**
**Re:**   **Terms & Conditions for Basic Cable Employment** ...............................**50**
**Re:**   **Electronic Multi-Tracking Provision** ................................................**51**
**Re:**   **Promos Produced by a Network Signatory** ........................................**51**
**Re:**   **Exhibition of Television Programs Transmitted Via New  Media** ............................**52**
**Re:**   **Productions Made for New Media**.......................................... ..................**55**
**Re:**   **New Media Bargaining History**..........................................................**61**
**Re:**   **New Media Exhibition**....................................................................**61**
**Re:**   **Articles 5(A), 5(E), and 12(B)**....................................................... ...............**62**
**INDEX**  ......................................................................................**63**

# TELEVISION VIDEOTAPE AGREEMENT

**American Federation of Musicians**
**of the United States and Canada**
**1501 Broadway, Suite 600**
**New York, New York 10036**

This Agreement sets forth the terms and conditions, including those set forth in Exhibits I, II and III hereto attached, pursuant to which persons covered by this Agreement may be employed during the period commencing January 27, 2013, and expiring midnight February 2, 2016, in the production of programs which embody musical performances by instrumental Musicians and/or pictures of such Musicians rendering musical performances, which programs are intended for network television broadcast or for syndication, whether live or recorded programs (hereinafter referred to as "programs") but not including recorded programs of the type traditionally produced under the AFM Basic Television Film Agreement.

## 1.     SCOPE OF AGREEMENT

### (A)     General Coverage

This Agreement shall cover and relate to members of the American Federation of Musicians of the United States and Canada (herein sometimes called the "Federation") wherever they may be employed by us in network television broadcasting or in producing programs for syndication, whether live or produced on videotape or kinescope, as Instrumental Musicians, Leaders, Contractors, Arrangers, Orchestrators, Copyists, Production Musicians and Librarians (herein sometimes called "Musicians") and to any other  persons when they shall perform such services for us in the United States, its territories and possessions (including Puerto Rico), and in Canada.  The Federation shall exercise full authority in order that its locals and members engaged in such activities shall do nothing in derogation of the terms and intent of this Agreement.

### (B)     Effect of Non-Renewal of This Agreement

Any contract in existence at the termination of this Agreement (whether such termination is caused by expiration, breach, or otherwise), made and entered into by us with local unions, members of the Federation, licensed booking agents, personnel managers, producers, symphony associations, or others, for the employment and rendition of services covered by this Agreement, shall not impose any obligation to render further musical services for us unless this Agreement is not renewed or a new one is not entered into.  Employees covered by this Agreement may, at their option, render services to any others without obligation or liability to us.

## 2.     UNION RECOGNITION

We hereby recognize the Federation as the exclusive bargaining representative of persons employed   as Musicians, who are members of the Federation, or who are employed by us in the areas designated in Subparagraph 1(A) hereof.

## 3.     UNION SECURITY

(A)      The following provision contained in this Subparagraph (A) shall apply to services to be rendered hereunder in Canada where not prohibited by applicable law.  Such provision shall also be included in and, whether or not so included, shall be deemed part of all contracts calling for such services, at places or under circumstances as aforesaid, between the Employer and persons employed in classifications covered by this Agreement:  "Only the services of members in good standing of the American Federation of Musicians of the United States and Canada shall be used for the performance of any work within a classification covered by this Agreement."

(B)     The following provisions contained in this Subparagraph (B) shall apply to services rendered hereunder in the United States and shall be included in and, whether or not so included, shall be deemed a part of all contracts calling for such services between the Employer and persons employed in a classification covered by this Agreement:  "Persons who are employees of the Employer on the date of signing of this Agreement or on its effective date (whichever is later), who are members of the Federation, shall be continued in their employment by the Employer only so long as they continue in their membership in good standing in the Federation.  All other employees in a classification covered by this Agreement, shall on or before the thirtieth (30th) day following this commencement of their employment or the effective date of this Agreement, whichever is later, become and continue to be members in good standing of the Federation as a condition of their employment.  The provisions of this Paragraph shall not become effective unless permitted by applicable law."

(C)     As to employees covered by this Agreement who are members of the American Federation of Musicians of the United States and Canada, and to the extent to which the inclusion and enforcement of this Paragraph is not prohibited by any applicable law, nothing in this Agreement shall ever be construed so as to interfere with any obligation which they may owe to the American Federation of Musicians of the United States and Canada as members thereof.

(D)     Any employees covered by this Agreement shall be free to suspend or terminate their services by reason of any strike, ban, or unfair list of the Federation or of any Federation local union which has been approved or sanctioned by the Federation and shall be free to accept and engage in other employment of the same or similar character, or otherwise, for other employers or persons, firms or corporations without any restraint, hindrance, penalty, obligation or liability whatever, any other provisions of this Agreement to the contrary notwithstanding.  The Employer shall not request or require any employee to work in the premises of any person, firm or corporation who is not in good standing with the Federation according to lists published by the Federation in the "International Musician" or to specific notice to the Employer.  Nothing in this Paragraph shall require the Employer to do or refrain from doing any act unless and until permitted by applicable law.

(E)     All present provisions of the bylaws, rules and regulations of the Federation are made part of this Agreement as though fully set forth herein to the extent to which their inclusion and enforcement as part of this Agreement are not prohibited by any applicable law.  No changes in the Federation's bylaws, rules and regulations which may be made during the term of this Agreement shall be effective to contravene any of the provisions hereof.  The Employer acknowledges its responsibility to be fully acquainted, now and for the duration of this Agreement, with the present contents of the Federation's by-laws, rules and regulations.


4.     **USE OF LIVE MUSIC**

During the term of this Agreement, we shall utilize live music exclusively for all programs produced by or for us in which any music is used.  All programs produced by or for us in the United States or Canada, if scored, shall be scored in the United States or Canada.


5.     **SOUND TRACK REGULATIONS**

(A)     We will not use or deal with sound track made hereunder for any purpose whatsoever except to accompany the program for which such sound track was originally produced and except as provided in Exhibit I, Paragraph Q, and Subparagraph (F) hereof.

(B)     We will not use any sound track in any program which is the subject of this Agreement unless such sound track is recorded under the terms of this Agreement.  No sound track recorded under the terms of this Agreement may be augmented by sound tracks which are not recorded under the terms of this Agreement.

(C)     Without regard to the duration of this Agreement, we shall not dub or give permission to others so to do and we shall prevent others from so doing, any sound track containing performances by persons

covered by this Agreement for the purposes of producing phonograph records or similar devices (nor shall we give permission to others so to do and we shall prevent others from so doing) unless prior notice of intention so to do has been given to the office of the President of the Federation.  In the event of such dubbing, we shall pay to all persons covered by this Agreement, as additional compensation for the rendition of such original performances, an amount equal to the scale for such new use and shall also make any and all additional payments applicable to such new use.

(D)      The substances and intent of (A)-(C) above, shall be incorporated into all agreements made by us relating to the selling, licensing, lending, giving, licensing, exhibition, utilizing, or other disposition or use of the programs which are the subject of this Agreement.

(E)      No part of any kinescopes, videotapes or sound tracks made pursuant to this Agreement shall be extracted or used for purposes other than those specifically permitted by this Agreement so long as said kinescopes or videotapes remain in existence.

(F)      Use of Excerpts ("Clips")

    1.      Promotional Uses.  Excerpts from a covered program may be used for promotional purposes without consent or any additional payments, provided that no more than 5 minutes of excerpts (10 minutes of excerpts for programs 90 minutes or longer) are used from any single episode or program provided that such excerpt may be used at any time before and not more than three (3) years beyond the scheduled broadcast, except that the three (3) year limit shall not apply to the use of such excerpts for any musician engaged on the program as part of a house band or otherwise regularly engaged on the program.

    2.      Programs

      (a)      Without constituting a reuse or requiring that reuse payments be made, excerpts from programs produced under this Agreement may be used in television industry awards programs such as the Emmy Awards program.

      (b)(i)      Except as provided above, excerpts which contain music from television programs and motion picture films, produced under AFM collective bargaining agreements which place restrictions on the use of such music, or would otherwise require rerun payments for the use of such music, may be used in an entertainment program (including, but not limited to, an "anniversary" program) produced under this Agreement, provided that all those rendering musical services for the original production receive payment of an amount, per excerpt, equal to 50% of the  applicable air rate of the program in which the  clip is being utilized; provided that the maximum payment shall be equal to the two hour variety show air rate. It is also agreed that in those situations where excerpts are utilized of a musician(s) on a program who also renders musical services for such program, then that musician(s) shall not receive any payment for the first such excerpt (that musician(s) shall receive a payment based on the formula set forth above commencing with the second excerpt and each subsequent excerpt utilized).

      When excerpts from a strip variety show are used in an "anniversary" program of that strip variety show the payment per excerpt will be equal to the one and one-half (1½) hour Strip Variety Program air rate.

      When an excerpt consists of a complete production number, the payment shall be that of the minimum guarantee for the program in which the clip is utilized (air rate plus guaranteed rehearsal hours), with a maximum payment equal to a two (2) hour program.

      (ii)      When an excerpt as provided in this Subparagraph (b)(i) is used on a local program, the payment shall be fifty percent (50%) of the preceding rates. Advance notice, where feasible, of the contemplated use of the excerpts will be given to the Federation.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

(iii)     The foregoing does not apply to compilation programs (programs consisting entirely of excerpts).  In such instances, a separate agreement will be made with the federation.

6.      **WAGES**

For services rendered by the persons covered by this Agreement in the making of programs hereunder, we shall pay at least Federation scale as provided in Exhibits I, II and III annexed hereto, and we will fully and faithfully perform the terms and conditions otherwise set forth in said Exhibits and in our individual agreements with such Musicians.  Said wages being due and payable within fifteen (15) business days after original performance, except as follows:

Wages earned under Exhibit I(Q) (Scoring for Daytime Serials and Strip Game Shows) and Exhibit I(S) (Theme Music) and for special engagements where no house band is employed are due and payable within twenty (20) business days after original performance.

7.      **PENSION WELFARE FUNDS**

We shall contribute eleven percent (11%) of all earnings of whatever nature covered by this Agreement, computed at scale, (i) with respect to services rendered in the United States, to the American Federation of Musicians and Employers Pension Fund, created pursuant to Trust Indenture, dated October 2, 1959; and (ii) with respect to services rendered in the Dominion of Canada, to the American Federation of Musicians and Employers Pension Plan Welfare Fund (Canada), created pursuant to Agreement and Declaration of Trust dated April 9, 1962.  We agree to be legally bound by the Agreement and Declaration of Trust establishing the American Federation of Musicians and Employers' Pension Fund, as amended from time to time, which is incorporated by reference into this Agreement.

(A)     We shall submit such reports in such form as the Trustees may reasonably require and our records shall be subject to such reasonable audit by the Trustees as the Trustees may require.

(B)     We agree that we shall furnish to the Federation, simultaneously with our delivery thereof to the Trustees, copies of any and all statements submitted to such Trustees under said trust indentures.

(C)     The Federation and said Trustees, or either of them, may enforce the provisions contained in this Paragraph 7.

(D)     Payments will be made simultaneously with Musicians wage scales.

8.      **REUSE**

(A)     (i)       Upon a second or subsequent showing of any programs made during the term of this Agreement, in any market in the United States, its territories and possessions (including Puerto Rico) and in Canada; the following percentages of the scale payment set forth in Exhibits I and II hereto, shall be paid within fifteen (15) business days of such reuse to each Instrumentalist, Leader, Contractor and Music Sound Consultant who originally performed services in connection with such program (including, but not limited to, rehearsal services rendered prior to performance), except that for "off network" shows (shows in syndication that were originally on network), these payments will be due within thirty(30) business days of the airing, and for programs produced under Exhibit I, Paragraph Q (Scoring for Daytime Serials and Strip Game Shows) and Exhibit I, Paragraph S (Theme Music), these payments will be due within thirty (30) business days of the date of the airing unless the producer elects to use the optional payment formula under Exhibit I, Paragraph S, in which case these payments will be due within twenty (20) business days of the date of the airing.

| RUN | PERCENTAGE |
|---|---|
| Second | 75% |
| Third | 75% |
| Fourth | 50% |
| Fifth | 50% |
| Sixth | 50% |
| Seventh | 10% |
| Eighth and each subsequent run | 5% |

SPECIAL REPLAY RATES

(ii)     For replays of any programs that occur between 2 a.m. and 6 a.m. in any market in the United States, its territories and possessions (including Puerto Rico) and in Canada a Special Replay Rate shall be established as follows:

The following percentages of the scale payments set forth in Exhibits I and II hereto, shall be paid within fifteen (15) business days of such reuse to each Instrumentalist, Leader, Contractor, and Music Sound Consultant who originally performed services in connection with such program (including but not limited to rehearsal services rendered prior to performance).

| RUN | PERCENTAGE |
|---|---|
| Second | 37.5% |
| Third | 37.5% |
| Fourth | 25% |
| Fifth | 25% |
| Sixth | 25% |
| Seventh | 10% |
| Eighth and each subsequent run | 5% |

Any listed runs in this time period will not be counted as "network reruns."

Should any programs be otherwise repeated on the network outside this time period 2 a.m.– 6 a.m. (e.g., a repeat of "The Tonight Show" in its regular time period), the rerun obligations under Article 8(A)(i) will apply.

When any daytime serial is replayed in the time period from 2 a.m. to 6 a.m. and within (24) hours of the original broadcast of the same episode, the residual obligation will be twenty-five (25%) of the replay scale under Article 8(A)(i) for each such replay.  If not replayed within twenty-four (24) hours, then the Special Replay Rates in Article 8(A)(ii) will apply.

(iii)     Arrangers, Orchestrators, and Production Musicians shall receive the applicable percentage payment for reuse based upon actual wages earned at scale, but in no event shall such reuse payment exceed one hundred fifty percent (150%) of the reuse payment to the Leader computed at Leader's scale.

Copyists and Librarians shall receive the applicable percentage payments for reuse based upon actual wages earned at scale, but in no event shall such reuse payment exceed one hundred fifty percent  (150%) of the reuse payment to the Instrumentalists computed at scale.

(iv)     Notwithstanding the above, for programs not being exhibited in syndication as of May 31, 1986, the above percentages will be applied to a "Domestic Syndication Residual Base" when such reuse is in syndication.

As used herein, the term "Domestic Syndication Residual Base" shall mean, with respect to each Instrumentalist, Leader, Contractor and Music Sound Consultant who performed services in connection with such program, the applicable scale earnings to a maximum of one hundred fifty percent (150%) of the applicable air rate plus guaranteed rehearsal; and with respect to Arrangers, Orchestrators and Production Musicians, such term shall mean the applicable scale earnings, but not more than one hundred fifty percent (150%) of Leader's "Domestic Syndication Residual Base;" and with respect to Copyists and Librarians, such term shall mean the applicable scale earnings, but not more than one   hundred fifty percent (150%) of Instrumentalist's "Domestic Syndication Residual Base."

With respect to program series currently being exhibited in syndication on May 31, 1986, the formula in this Paragraph (A)(ii) may not be used for any program in such series.

(B)     A second showing in any market shall start the second run, a third showing in any market shall start the third run, and similarly with respect to all subsequent runs.

(C)     Where excessive rehearsal hours have resulted from mechanical difficulties and/or failure of equipment, the number of rehearsal hours to be included in the scale pay for the purpose of determining the percentage payments due under this Paragraph shall be limited as follows:  for a one-half (½) hour program – a maximum of ten (10) hours; for a one (1) hour program – a maximum of fifteen (15) hours; for a one and one-half (1½) hour or longer program – a maximum of twenty (20) hours.

(D)     Domestic Reuse in a Foreign Language

Producer shall have the option of applying the payment provisions in Subparagraphs (i) – (iii) below, to the second and any subsequent broadcast in any domestic area of a program in a language other than English in lieu of the foregoing provisions of Paragraph 8, in which case such broadcasts shall not be treated as domestic runs:

(i)     The Producer will pay for the benefit of the Musicians on such a program who would have been entitled to a payment, five percent (5%) of the applicable supplemental market base amount.

(ii)     The payment provided in (i) above, shall be made to the Federation for distribution to the Musicians entitled thereto in accordance with a formula to be established by the parties. The Producer may credit any individually negotiated payment made to any Musician for such subsequent domestic broadcast in a language other than English against such Musician's pro rata share pursuant to this Subparagraph (ii).  Additionally, a contribution based upon a percentage of the fees payable under this Subparagraph shall be made to the AFM Pension Fund.  The applicable percentage shall be the same as the percentage of scale payable to the AFM Pension Fund under the AFM Agreement under which the program was produced.

(iii)     If any agreement for broadcasts in a language other than English includes more than one (1) program, or includes both rights to telecast in a language other than English and other rights, the Producer shall make a reasonable allocation for the purpose of determining payments hereunder.


9.     **FOREIGN USE**

(A)     Programs made under this and prior agreements (except for programs already exhibited in foreign countries) may be broadcast, (without limits as to numbers of showings) by means of satellite, cable, recording or other means, now or hereafter developed, outside the United States, its territories and possessions (including Puerto Rico) and outside Canada and its territories and possessions, on television stations where no admission is charged for the privilege of attending or viewing such broadcast before, during or after transmission over television, and upon payment to each Instrumentalist,

Leader, Contractor, Production Musician, Arranger, Orchestrator, Copyist and Librarian who performed services in connection with such program of a percentage of "Foreign Residual Base," determined in accordance with this Paragraph 9.

As used herein, except with respect to programs specified in Subparagraph (E)(i) below, the term "Foreign Residual Base" shall mean, with respect to each Instrumentalist, Leader, Contractor and Production Musician who performed services in connection with the program, the applicable scale set forth in Exhibits I and II hereof to a maximum of one hundred fifty percent (150%) of the applicable air rate plus guaranteed rehearsal for programs of sixty (60) minutes or less, and one hundred twenty-five percent (125%) of the applicable air rate plus guaranteed rehearsal for programs in excess of sixty (60) minutes.  With respect to each such program or series, the foreign use compensation percentage shall be determined under the Foreign Area formula (Section (1) below), unless the Producer elects to utilize the Distributor's Foreign Gross formula (Section (2) below), subject to the limitation stated in Subparagraph (E)(i) below.

(1)  Foreign Area Formula

Under this formula, such percentage shall be:

(a)  For all such foreign use, forty-five percent (45%) of the "Foreign Residual Base"; or

(b)  For broadcast of such programs on such television stations in the following specified areas, the percentage of the "Foreign Residual Base" set forth alongside each area:

| Foreign Area | | Percentage |
|---|---|---|
| Area 1 | England, Scotland, Wales and Ireland and the Island of Cyprus | 15% |
| Area 2 | All European countries including Iceland, but excluding those countries in Area 1 | 15% |
| Area 3 | The entire continent of Africa and adjacent islands including the Island of Madagascar | 5% |
| Area 4 | The continents of Asia and Australia, New Zealand, Japan, the East Indies and all the islands in the Pacific and Indian Oceans (except those adjacent to the continents of Africa, North America and South America) | 5% |
| Area 5 | Central America, Mexico, South America, Greenland, the Caribbean Islands and all other islands adjacent to the American continents | 5% |

(c)  Foreign use payments shall be due and payable not later than sixty (60) days following the date of foreign broadcast.

(2)  Distributor's Foreign Gross Formula

(a)  This formula (instead of the Foreign Area Formula set forth in Section (1) above) may be elected by the Producer for any such program or series except as otherwise provided in Subparagraph (E) of this Paragraph 9, provided that the Producer must give written notice of such election to the Federation prior to the first

broadcast in any "Foreign Area," and such election shall be irrevocable as to that program or series. Under this formula, such percentage shall be:

(i)     Fifteen percent (15%) of the Foreign Residual Base for such program, payable not later than sixty (60) days after the first foreign telecast thereof.

(ii)     An additional ten percent (10%) of the Foreign Residual Base for such program when the Distributor's Foreign Gross of any such television program has exceeded $7,000 for a program of one-half (½) hour or less; $13,000 for a program of more than one-half (½) hour, but not more than one (1) hour; or $18,000 if such program is more than one (1) hour in length, payable not later than sixty (60) days after such gross has been so exceeded.

(iii)     An additional ten percent (10%) of the Foreign Residual Base for such program when the Distributor's Foreign Gross of any such television program has exceeded $10,000 for a program of one-half (½) hour or less; $18,000 for a program of more than one-half (½) hour, but not more than one (1) hour; or $24,000 if such program is one (1) hour or more in length, payable not later than sixty (60) days after such gross has been so exceeded.

After payment of the amounts specified in (i), (ii) and (iii) above, with respect to any program, no further sums shall be payable for foreign telecasting of such program.

(b)     As used herein, the term "Distributor's Foreign Gross" shall mean, with respect to any such program, the absolute gross income realized by the distributor of such program from the foreign telecasting thereof and including, in the case of a "foreign territorial sale" by any such distributor, the income realized from such sales by such distributor, but not the income realized by the "purchaser" or "licensee." The phrase "absolute gross income" shall not include:

(i)     Sums realized or held by the way of deposits or security until and unless earned, other than such sums as are nonreturnable.

(ii)     Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of the program or on any moneys to be remitted to or by the distributor, but there shall not be excluded from Distributor's Foreign Gross any net income, franchise tax or excess profit tax or similar tax payable by the distributor on its net income or for the privilege of doing business.

(iii)     Frozen foreign currency until the distributor shall have either the right to use such foreign currency in or to transmit such foreign currency from the country or territory where it is frozen. In the event such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the prevailing free market rate of exchange at the time such right to use or transmit it accrues.

(B)     Arrangers, Orchestrators and Production Musicians shall receive the applicable percentage payment for foreign use based upon actual wages earned at scale, but in no event shall such foreign use payment exceed the foreign use payment to the Leader computed at Leader's scale. Copyists and Librarians shall receive the applicable percentage payments for foreign use based upon actual wages earned at scale, but in no event shall such foreign use payment exceed the foreign use payment to the Instrumentalists computed at scale.

(C)     The rates of pay applicable to programs made under this Agreement and transmitted by means of satellite, cable, recording or other means now or hereafter developed, for broadcast only in the foreign areas set forth above (without limit as to number of showings), shall be seventy-five percent (75%) of the scale pay set forth in Exhibits I, II and III hereto.

(D)     Where excessive rehearsal hours have resulted from mechanical difficulties and/or failure of equipment, the number of rehearsal hours to be included in the scale pay for the purpose of determining the percentage payment due under this Paragraph shall be limited as follows:  for a one-half (½) hour program – a maximum of ten (10) hours; for a one (1) hour program – a maximum of fifteen (15) hours; for a one and one-half (1½) hour or longer program – a maximum of twenty (20) hours.

(E)     <u>Foreign Use of Live Programs Transmitted by Means of Telstar or Other Devices</u>

(i)     Live programs made under this Agreement, or any local agreement of even date herewith, that are transmitted by means of satellite, cable or other devices now or hereafter developed, for broadcast in foreign areas simultaneous with or subsequent to the broadcast in an area set forth in this Agreement, shall be subject to the rates and conditions set forth in Paragraph A above; provided that, with respect to programs that are pre-sold worldwide for simultaneous domestic and foreign broadcast (*e.g.*, the Academy Award Show), the Producer may not elect the formula set forth in Section (2), and with respect to such programs, "Foreign Residual Base" shall mean applicable scale pay set forth in Exhibits I and II hereof.

(ii)     Live programs made under this Agreement, or any local agreement of even date herewith, that are transmitted by means of satellite, cable or other devices now or hereafter developed, for broadcast in foreign areas only, shall be subject to the rates and conditions set forth in Paragraph C, above.

**10.     AUDITION PROGRAMS**

(A)     <u>Right to Produce</u>

We may use persons covered by this Agreement in the production of audition programs to solicit sponsors for live shows, subject, however, to the following conditions:

(i)     <u>Rates of Pay</u>.  The rates for audition programs shall be sixty percent (60%) of the scale pay set forth in Exhibits I, II and III.

(ii)     <u>Type of Use</u>.  Under no circumstances will we exhibit such audition programs publicly on television, in theaters, or in any other manner, except privately to prospective clients and advertisers for the purpose of selling a show of which the audition program is a sample.

(iii)     <u>Retention</u>.  We will, at all times, retain ownership and control of all recordings and reproductions of such programs and each such recording or reproduction shall bear a prominent legend, the language of which shall be approved by the Federation, setting forth the conditions set forth in Subparagraph 10(A)(ii) above.

(iv)     The provisions of Subparagraphs 10(A) (ii) and (iii) above shall remain in effect so long as such audition programs remain in existence.

(B)     <u>Copies and Lists</u>

(i)     <u>Copies</u>.  Upon request, we will furnish the Federation with a copy of any audition program made pursuant to the provisions of this Paragraph 10.

(ii)     <u>Lists</u>.  At the end of each month, we shall furnish the Federation with a list of audition programs made pursuant to the provisions of this Paragraph 10, during said month.

**11.     COPIES AND LISTS**

(A)     <u>Program Catalogues</u>

Following the execution of this Agreement, we shall furnish to the Federation, promptly upon request, a copy of all our program catalogues, and thereafter from time to time, a schedule listing all amendments and additions thereto, as and when established.

(B)     Programs

At the end of each month, we shall advise the Federation of all covered programs made by us hereunder during each month, and of the number or other identification thereof; we shall furnish the Federation with lists of covered programs; and we shall furnish any additional information in connection with any such covered programs which the Federation may reasonably require.  Upon request by the Federation, we shall promptly furnish to it a copy of such covered programs.  We shall respond promptly to reasonable requests by the Federation for information relating to our performance of the terms and conditions of this Agreement and of any and all individual agreements with members of the Federation.

(C)     At the end of each month, we shall furnish the Federation with a list of all programs which have been rerun in any market in the United States, its territories and possessions (including Puerto Rico) and in Canada, its territories and possessions, pursuant to Paragraph 8 of this Agreement.

(D)     At the end of each month, we shall furnish the Federation with a list of all programs which have been exhibited outside the United States, its territories and possessions (including Puerto Rico) and Canada, its territories and possessions (foreign use), pursuant to Paragraph 9 of this Agreement.

**12.     ACTION REQUIRING UNION APPROVAL**

(A)     Use of Facilities

We shall not make, or permit the use of our facilities for making, or otherwise give aid and assistance in the making of any programs which shall embody pictures of Musicians or instrumental music, for or on account of any other person engaged in the production or exploitation of programs, unless authorized in writing by the Federation.

(B)     Use of Programs Other Than by Television Broadcast

It is agreed that unless your written permission is first had and obtained, neither we, nor our subsidiary or affiliated companies will use or grant any rights to use (whether by way of sale, assignment, lease, license, or other transfer of title or permission to use, and whether by operation of law or otherwise), in whole or in part, any program that, in whole or in part, embodies pictures of Instrumental Musicians rendering musical performances of such Musicians, which are recorded and/or photographed under this Agreement, for purposes other than exhibition over television broadcast, where no admission is charged for the privilege of attending such exhibition before, during or after transmission over television.  The substance and intent of this Subparagraph shall be incorporated in all agreements pursuant to which we shall grant any rights to use such programs as aforesaid.  The obligations created by this Subparagraph shall survive this Agreement for so long as the programs referred to in this Agreement shall be used.  It is further agreed that the Federation may enforce compliance with the provisions of this Subparagraph.

(C)     Contracts With Federation Members

The following provision shall be included in and, whether or not so included, shall be deemed part of all contracts calling for (covered) services between us and members of the Federation:  "This contract shall not become effective unless and until it shall be approved by the International Executive Board of the American Federation of Musicians or by a duly authorized agent thereof."

(D)     Assignment of This Agreement

This collective agreement shall be personal to each of us and shall not be transferable or assignable by operation of law or otherwise, without the consent in writing of the Federation.  Without such consent, we shall not transfer or assign any individual contract (or part thereof) for the performance of services of any member of the Federation or give anyone else control over such contract services.  Nevertheless, if the foregoing is violated and services are thereafter performed by such member of the Federation, the obligations and duties imposed by this Agreement shall be binding upon the transferee or assignee.  The obligations imposed by this Agreement shall be binding upon each of our subsidiaries engaged in the production of programs.  The Federation, at its option, may terminate this Agreement with any signatory hereto at any time after a transfer of any controlling interest in such signatory.

(E)      Transfer or Assignment of Programs

In the event that we shall sell, transfer, assign, or otherwise dispose of our television rights in programs made under this Agreement, we shall continue to be responsible for all the obligations and commitments which we have undertaken in this Agreement with respect to such programs, unless the Federation consents to the assumption of those obligations and commitments by the assignee or transferee.  We agree to give notice to you within thirty (30) days after each such sale, assignment or transfer.

**13.      SUPPLEMENTAL MARKETS**

(A)      The provisions of this Article shall apply to all programs initially produced for free television, either prior to or during the term of this Agreement, which are actually distributed in Supplemental Markets during the term of this Agreement.

(B)      Definition of Supplemental Markets

The term "Supplemental Markets," as used in this Agreement, means only the exhibition of television programs by means of cassettes (to the limited extent provided in Subparagraph (1) of this Paragraph), pay-type CATV, pay television or basic cable television, as those terms are hereafter defined in this Paragraph, and the exhibition of television programs on any commercial carrier such as commercial airlines, trains, ships and buses (referred to herein as "In-Flight").

(1)      Cassettes

For the purpose of this Agreement, a "cassette" is any audiovisual device, including without limitation, cassette, cartridge, phonogram or other similar audiovisual device now known or hereafter devised, containing a television program (recorded on film, disc, tapes or other material) and designed for replay on a home-type television screen.  The sale or rental of cassettes for replay on a home-type television screen in the home, for educational use, or in other closed circuit use such as hotel rooms constitutes the "Supplemental Market" for purposes of this Agreement.  The foregoing definition does not include the exhibition of a television program by cassette over a television broadcast station.

(2)      Pay-Type CATV

For the purpose of this Agreement, "pay-type CATV" is the exhibition of television programs on home-type television screens by means of transmission by a Community Antenna Television System (CATV) where, in addition to the obligatory general cable charge to the subscriber for the CATV service:  (i) a further charge is made for programs selected by the subscriber, or (ii) the subscriber has the option, by making payment in addition to the standard subscription charge, to receive special programming over one (1) or more channels that are not available to the subscriber without such additional payment.  Where no program charge or special channel charge is made to the subscriber in addition to the general cable charge, the transmission of programs by the CATV facility, including programming originated by the CATV facility, is free television exhibition for purposes of this Agreement and such exhibition shall not be considered a "Supplemental Market."

(3)      Pay Television

For the purpose of this Agreement, "pay television" is the exhibition of television programs on a home-type television screen by means of telecast, cable or closed circuit, in which the viewing audience pays to receive the program by making a separate payment for such specific programs.

(4)      Basic Cable Television

For the purpose of this Agreement, the term "basic cable," as distinguished from pay television or free television, refers to that type of exhibition which is commonly understood in the industry today to be basic cable exhibition.

(C)        Computation of Payment

(1)        Base Amounts

(a)        The following base amounts shall be used for computing payments to each Instrumental Musician, Leader, Contractor, Arranger and Orchestrator whose services were included in such television program:

| Type of Program | Base Amount Per Person Per Program |
|---|---|
| One-half (½) hour (and all strip programs including strip variety programs regardless of length) | $300.00 |
| One (1) hour | $375.00 |
| One and one-half (1½) hour | $450.00 |
| Two (2) hours | $525.00 |
| Each additional one-half (½) hour or fraction thereof | $ 75.00 |

(b)        Producer agrees to establish:  (i) for Librarians who performed services for such programs and whose names appear as such on the original Form B contract for the program; and (ii) for Copyists for such programs (limited to a maximum of five (5) Copyists), a base amount of $300 per person, per program, regardless of length.  If more than five (5) Copyists were actually employed on the program, the sum of $1,500 shall be divided equally among all such Copyists.

(2)        Supplemental Market Fees

(a)        Supplemental Market Fees shall be computed on the foregoing base amounts as follows:

(i)        (A)  Except for initial release on "In-Flight" or basic cable stations other than superstations (e.g., WTBS), or for educational use, when such television program is initially released in any Supplemental Market (or committed to release, as hereinbefore provided), the Musician shall be paid ten percent (10%) of the applicable base amount; and when the Distributor's gross receipts (as defined in Subsection (b) below) from the distribution of such television program in such Supplemental Markets equals $62,500, the Musician shall be paid an additional ten percent (10%) of the applicable base amount.

(B)  When such television program is initially released in the basic cable market (other than "superstations"), the Musicians shall be paid five percent (5%) of the applicable base amount.  When the Distributor's gross receipts (as defined in Subsection (b) below) from the distribution of such television program initially released in the basic cable market (other than "superstations") equals $62,500, the Musicians shall be paid an additional fifteen percent (15%) of the applicable base amount.  When such television program initially released in the basic cable market (other than "superstations") is subsequently released in another Supplemental Market (other than "In-Flight"), the Musicians shall be paid an additional five percent (5%) of the applicable base amount.

However, with respect to gross receipts from "In-Flight" distribution, thirty percent (30%) of the base amount shall be payable upon initial release of the program for such market, provided that the total payment or payments under this Subparagraph (2)(a) shall not exceed thirty percent (30%) of the applicable base amount.   The Producer shall pay one percent (1%) of

Distributor's gross receipts as defined in the AFM Basic Television Film Agreement from the distribution in Supplemental Markets for educational use, credited to each participating Musician pro rata. Effective June 1, 1999, such aggregate payments for educational use, shall be remitted for distribution to the Film Musicians Secondary Markets Fund *(previously known as the Theatrical and Television Motion Picture Special Payments Fund)*.

(ii)     When such gross receipts from the distribution of such television program in Supplemental Markets amount to $125,000, the following additional percentage of the base amount shall be due: ten percent (10%).

(iii)     When such gross receipts from the distribution of such television program in Supplemental Markets amount to $200,000, the following additional percentage of the base amount shall be due: twenty-five percent (25%).

(iv)     When such gross receipts from the distribution of such television program in Supplemental Markets amount to $300,000, the following additional percentage of the base amount shall be due: twenty-five percent (25%).

(v)     When such gross receipts from the distribution of such television program in Supplemental Markets amount to $400,000, the following additional percentage of the base amount shall be due: twenty-five percent (25%).

(vi)     When such gross receipts from the distribution of such television program in Supplemental Markets amount to $500,000, the following additional percentage of the base amount shall be due: twenty-five percent (25%).

(vii)     After each additional full increment of $100,000 of such gross receipts in excess of $500,000 the following additional percentage of the base amount shall be due: ten percent (10%).

(b)     Definition of Distributor's Gross Receipts Except For Educational Use

(i)     In applying the formula set forth in this Section for calculating Supplemental Market fees, Distributor's gross receipts shall be included in the formula at one hundred percent (100%) of the actual amount of such gross receipts for all Supplemental Markets.

(ii)     As used herein, the term "Distributor's gross receipts" shall mean the absolute gross income received by all Distributors (as hereinafter defined) of such television program from the Supplemental Market use thereof, anywhere in the world, and including the case of a "foreign territorial sale" by any such Distributor, the income received from such sale by such Distributor, but not the income received by the "purchaser" or the "licensee." "Distributor," as used in this Agreement, shall mean the Producer when it distributes such program for Supplemental Market use. Gross receipts at the retail level would not be Distributor's gross receipts hereunder. Further, if the Producer itself acts as Distributor and Retailer, a reasonable allocation of the retail gross receipts shall be made as between the Producer as Distributor and the Producer as Retailer, and only the former shall be deemed to be Distributor's gross receipts.

(iii)     The Distributor's gross receipts shall not include:

(A)     Sums realized or held by way of deposit as security, until and unless earned, other than such sums as are non-refundable;

(B)    Rebates, credits or repayments for cassettes returned (and in this connection the Producer shall have the right to set up a reasonable reserve for returns);

(C)    Sums required to be paid or withheld as taxes, in the nature of turnover taxes, sales taxes or similar taxes based on the actual receipts of such program or on any moneys to be remitted to or by the Producer or such other Distributor; but there shall not be excluded from Distributor's gross receipts any net income tax, franchise tax or excess profit tax or similar tax payable by the Producer or such Distributor on its net income or for the privilege of doing business;

(D)    Frozen foreign currency until the Producer shall either have the right to freely use such foreign currency, or Producer or Distributor has the right to transmit to the United States to Producer or Distributor such foreign currency from the country or territory where it is frozen.  If such currency may be utilized or transmitted as aforesaid, it shall be deemed to have been converted to United States dollars at the rate of exchange at which such currency was actually transmitted to the United States as aforesaid, or if not actually transmitted, then at the prevailing free market rate of exchange at the time such right to use or to transmit occurs.

Frozen foreign currency shall be deemed to be unblocked on the basis of "first in, first out," unless otherwise allocated by local foreign fiscal authorities.  Allocation of such unblocked funds as between revenue which serves as the basis of determining payments hereunder and other revenue, shall be on a proportional basis, subject to different earmarking by local foreign fiscal authorities.

(E)    Receipts attributable to distribution for educational use.

(c)    <u>Allocation of Gross Receipts</u>

If any agreement for distribution in the Supplemental Market includes more than one (1) program, or includes both Supplemental Market rights and other rights, the Producer shall make a reasonable allocation for the purpose of determining payments due hereunder.

(d)    No pension or welfare contributions to the AFM funds shall be required to be paid on Supplemental Market Fees.

(e)    <u>Time of Payments and Reports</u>

Payments of any Supplemental Market fees due under this Article 13 shall be made annually on the basis of annual statements, as hereinafter provided, except that the initial fees payable on release in Supplemental Markets C(2)(a)(i) shall be paid within sixty (60) days after such release.  Producer shall furnish to the Federation written annual reports showing the Producer's gross receipts, in accordance with the foregoing, from distribution of programs in Supplemental Markets.  If the Producer makes any payment on the basis of an examination of the books conducted by the Federation, the Federation shall be entitled to deduct from such payment its costs of such examination.  The Federation shall have the right, at reasonable times, to examine the books and records of the Producer insofar as they relate to the Producer's gross from distribution in Supplemental Markets.

(f)    At such times as the gross receipts from the sale of cassettes totals $10 million of total industry sales, the Federation shall have the right to reopen the cassette provisions of this Agreement for negotiation.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

(3)     Optional Cassette Formula

The following formula, rather than the formula of Paragraphs C(1) and (2) above, may be elected by the Producer for any program or series produced under this Agreement or any prior AFM TV Videotape Agreement not already released in videocassette/disc supplemental market distribution.  Under this formula, the Musicians shall receive an aggregate payment(s) equal to two percent (2%) of Distributor's gross receipts as defined in subparagraphs (a) and (b) below.  Effective June 1, 1999 such aggregate payment shall be remitted to the Film Musicians Secondary Markets Fund on a twice per calendar year basis along with accompanying reports (identifying the programs, the total amount of money owing for each program and the Musicians whose services were used in connection with the videocassette/disc release).

For purposes of calculating Supplemental Markets fees due under this Article 13(C)(3) arising from the distribution of programs on "cassettes," as defined above, the term "Distributor's gross" is defined as follows:

(a)     If the Producer is the Distributor or the Distributor is owned by or affiliated with the Producer, the "Distributor's gross" derived from the distribution of such program by "cassettes" shall be twenty percent (20%) of the worldwide wholesale receipts derived by the Distributor.  In such cases, if the Distributor is also the retailer, a reasonable allocation of the retail gross receipts shall be made as between the Distributor as distributor and the Distributor as retailer, and twenty percent (20%) of the former only shall be deemed to be "Distributor's gross."

(b)     If the Producer is not the Distributor and is not owned by or affiliated with the Distributor, the "Distributor's gross" shall be one hundred percent (100%) of the fees received by the Producer from licensing the right to distribute such program by cassette.

(4)     Optional Basic Cable and "In-Flight" Formula

The following formula rather than the formula of Paragraphs (C)(1) and (2) above may be elected by the Producer for release in basic cable and/or "In-Flight" for any program or series produced under this Agreement or any prior AFM Television Videotape Agreement.  Under this formula the musicians shall receive an aggregate payment(s) equal to 1.2% of Distributor's gross receipts as defined in this Agreement.  Effective June 1, 1999 such aggregate payment(s) shall be remitted to the Film Musicians Secondary Markets Fund for distribution.

(5)     Optional Pay TV Formula

The following formula rather than the formula of Paragraphs (C)(1) and (2) above may be elected by the Producer for release in Pay Type CATV and/or Pay Television of any program or series produced under this Agreement or any prior AFM TV Videotape Agreement.  Under this formula, the musicians shall receive an aggregate payments(s) equal to one percent (1%) of Distributors' gross receipts as defined in this Agreement.  Such aggregate payment(s) shall be remitted for distribution to the Live TV subfund of the Film Musicians Secondary Markets Fund.

(D)     Symphony and Opera Programs

Symphony and Opera programs are specifically excluded from all of the provisions of this Article.

**14.     MORE FAVORABLE TERMS**

If, during the term hereof, the Federation shall enter into an agreement with any other producer upon terms more favorable than or different from those contained in this Agreement, Producer shall have the right at its option to cause this Agreement to be conformed therewith.

15.    **ACCESS TO THE STUDIO**

A duly authorized representative of the Federation or its affiliated local in the area involved shall be granted access to the studio or other place where services are being performed under this Agreement, at such times as are necessary for the proper conduct of their business.

16.    **HEALTH AND SAFETY**

The employer will not require employees hereunder to work under conditions which present a health or safety hazard.

17.    **NO DISCRIMINATION**

The parties agree not to discriminate against any Musician because of race, sex, creed, color, national origin or age.

18.    **INDUSTRY–FEDERATION COMMITTEE**

A joint Industry–Federation Committee consisting of an equal number of representatives from each side shall be established.  The joint committee shall meet promptly, upon the written request of either party, to review the administration of this Agreement, to discuss and attempt to resolve any disputes concerning alleged violations of this Agreement, and to discuss any other issues of mutual interest to the parties including the following items:

(A)    Grievances that may arise concerning the interpretation, application and/or enforcement of this Agreement; provided, however, that with respect to any dispute pending at the effective date of this Agreement, the parties preserve their rights to initiate litigation without submitting that dispute to the Industry–Federation Committee.

(B)    Notification of Release — The parties shall study the Federation's needs to obtain written notification from the producer upon release of any program (produced under this Agreement) as a reuse, Foreign Use or Supplemental Market release.

(C)    New Use — The parties shall review the practices under Exhibit III E(2).

(D)    Cassette Compilation Programs

(E)    Sequencing as described in Exhibit I V of this Agreement.

(F)    Contract Language Review

(G)    Variety Specials Advance Notice — Advance notice of postponement or cancellation in connection with variety specials.

## EXHIBIT I:  MINIMUM WAGES & OTHER WORKING CONDITIONS
## (RECORDING INSTRUMENTALISTS, LEADERS, CONTRACTORS)

The minimum scale for Instrumentalists, Leaders and Contractors shall be the rates and conditions set forth below:

**A.   BASIC RATES**

|  | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **1.   Variety Programs (other than strips)** | | | |
| **For a one-half (½) hour show,** per Musician, including two (2) hours rehearsal on the same day (including air rate of $104.30, effective 1/27/13, $106.35 effective 1/26/14, $108.50 effective 1/25/15) | $255.35 | $260.45 | $265.65 |
| **For a one (1) hour show,** per Musician, including four (4) hours rehearsal on the same day (including air rate of $130.70 effective 1/27/13, $133.30 effective 1/26/14, $135.95 effective 1/25/15) | $432.80 | $441.45 | $450.30 |
| **For a one and one-half (1½) hour show,** per Musician, including six (6) hours rehearsal, which may be scheduled on two (2) consecutive days, with a minimum of four (4) hours on the last day (including air rate of $195.00 effective 1/27/13, $198.90 effective 1/26/14, $202.90 effective 1/27/15) | $648.20 | $661.15 | $674.40 |
| **For shows over one and one-half (1½) hours** the air rate for each fifteen (15) minutes: | $32.55 | $33.20 | $33.90 |
| **Rehearsal Pay,** per Musician, one (1) hour | $75.55 | $77.05 | $78.60 |
| **For additional rehearsal time—**each fifteen (15) minutes or fraction thereof per Musician | $18.90 | $19.25 | $19.65 |
| **Leader or Single Musician** | Double recording Musician's rate | | |
| **2.   Other Programs, including Strip Variety Shows [five (5) day per week shows]** | | | |
| **For a one-half (½) hour show,** per Musician, including one (1) hour rehearsal within a three (3) hour time span (including air rate of $132.90 effective 1/27/13, $135.60 effective 1/26/14, $138.30 effective 1/25/15) | $208.45 | $212.60 | $216.85 |

**Television Videotape Agreement**
**January 27, 2013 − February 2, 2016**

| A.      Basic Rates, Continued | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For a one (1) hour show,** per Musician, including two (2) hours rehearsal within a four(4) hour time span (including air rate of $158.95 effective 1/27/13, $162.15 effective 1/26/14, $165.40 effective 1/25/15) | $310.05 | $316.25 | $322.60 |
| **For a one and one-half (1½) hour show,** per Musician, including two (2) hours rehearsal within a five (5) hour time span (including air rate of $238.45 effective 1/27/13, $243.25 effective 1/26/14, $248.10 effective 1/25/15) | $389.55 | $397.30 | $405.25 |

(The two (2) hour guarantee on the one (1) hour and the one and one-half (1½) hour shows shall be adjusted to one and one-half (1½) hours when the orchestra consists of fifteen (15) or more Musicians including Leader and Contractor.)

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For shows over one and one-half (1½) hours** the air rate for each fifteen (15) minutes shall be | $39.70 | $40.50 | $41.35 |
| **Extra Rehearsal Pay,** per Musician one hour | $75.55 | $77.05 | $78.60 |
| **For additional rehearsal time—**each fifteen (15) minutes or fraction thereof per Musician | $18.90 | $19.25 | $19.65 |

**Leader or Single Musician**

**Double recording Musicians rate except one hundred twenty-five percent (125%) of scale for organist on daytime serials and on other daytime programs where one Musician plays background music.**

3.   **Strip Variety Shows [three (3) or four (4) days per week]**

**Four (4) days per week**

| For a one-half (½) hour show, per Musician, including one (1) hour rehearsal within a three (3) hour time span (including air rate of $146.25 effective 1/27/13, $149.15 effective 1/26/14, $152.15 effective 1/25/15) | $221.75 | $226.20 | $230.70 |
|---|---|---|---|

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

| A.      Basic Rates, Continued | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For a one (1) hour show,** per Musician, including two (2) hours rehearsal within a four (4) hour time span (including air rate of $175.65 effective 1/27/13, $179.20 effective 1/26/14, $182.75 effective 1/25/15) | $326.70 | $333.25 | $339.95 |
| **For a one and one-half (1½) hour show,** per Musician, including two (2) hours rehearsal within a five (5) hour time span (including air rate of $263.25 effective 1/27/13, $268.50 effective 1/26/14, $273.85 effective 1/25/15) | $414.30 | $422.60 | $431.05 |

(The two (2) hour guarantee on the one (1) hour and the one and one-half (1½) hour shows shall be adjusted to one and one-half (1½) hours when the orchestra consists of fifteen (15) or more Musicians including Leader and Contractor.)

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For shows over one and one-half (1½) hours,** the air rate for each fifteen (15) minutes shall be: | $45.15 | $46.05 | $46.95 |
| **Extra Rehearsal Pay,** per Musician one (1) hour | $75.55 | $77.05 | $78.60 |

**Leader or Single Musician**                                         Double recording Musicians' rates.

**Three (3) days per week**

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For a one-half (½) hour show,** per Musician, including one (1) hour rehearsal within a three (3) hour time span (including air rate of $163.90 effective 1/27/13, $167.15 effective 1/26/14, $170.50 effective 1/25/15) | $239.40 | $244.20 | $249.10 |
| **For a one-hour (1) show,** per Musician, including two (2) hours rehearsal within a four (4) hour time span (including air rate of $196.15 effective 1/27/13, $200.05 effective 1/26/14, $204.05 effective 1/25/15) | $347.20 | $354.15 | $361.25 |
| **For a one and one-half (1½) hour show,** per Musician, including two (2) hours rehearsal within a five (5) hour time span (including air rate of $292.40 effective 1/27/13, $298.25 effective 1/26/14, $304.20 effective 1/25/15) | $443.45 | $452.35 | $461.40 |

| A.    Basic Rates, Continued | **1/27/13** | **1/26/14** | **1/25/15** |
|---|---|---|---|

(The two (2) hour guarantee on the one (1) hour and the one and one-half (1½) hour shows shall be adjusted to one and one-half (1½) hours when the orchestra consists of fifteen (15) or more Musicians including Leader and Contractor.)

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| **For shows over one and one-half (1½) hours,** the air rate for each fifteen (15) minutes shall be | $51.20 | $52.20 | $53.25 |
| **Extra Rehearsal Pay,** per Musician one (1) hour | $75.55 | $77.05 | $78.60 |

**Leader or Single Musician:**                     Double recording Musicians' rate

**4.   Non-Prime Time Children's Variety Shows**

   (a)   Wage rates will be those prescribed in this Agreement for Variety  programs.

   (b)   With respect to such programs aired on Saturdays and Sundays prior to 1:00 p.m., the Employer shall have the option, conditioned on payment of two hundred twenty-five percent (225%) of scale prepaid at the time that payment for initial services is due, to four (4) runs of such program before invoking the balance of the rerun schedule.  Where such option is exercised, music preparation and Production Musicians likewise shall be prepaid two hundred twenty-five percent (225%) of their respective scales for four (4) runs, but in no event shall such payment exceed the payment to the Leader computed at Leader's scale hereunder in the case of Arrangers, Orchestrators and Production Musicians, and in the case of Copyists and Librarians, the payment to Instrumentalists computed at Instrumentalist scale hereunder.

**5.   Summer Replacement Programs**

For summer replacement shows played over a network, if produced between April 15th and July 15th of each year and exhibited during June, July and August, the wage rates are eighty percent (80%) of the regular variety show program rates.  In the event summer replacement programs are rerun at any other time, the rerun percentages shall be based on the full listed rates of the variety program sections of this Agreement.

**6.   Rehearsal Conditions**

   (a)   Rehearsal without videotape or pre-recording on any day prior to date of broadcast or date of completion of videotaping — Minimum of two (2) consecutive hours of rehearsal.

   (b)   Rehearsal with videotaping or pre-recording on any day prior to date of broadcast or date of completion of videotaping — Minimum of three (3) consecutive hours of rehearsal or videotaping. In the case of dramatic programs which regularly feature a variety act, material for up to five (5) programs may be pre-recorded in such pre-recorded session, provided that rehearsal hours credited in such session shall be no less than one (1) hour for each program in which such pre-recorded music shall appear; and provided further that in this case such programs shall be paid for as a variety program as to such variety act.

   (c)   Rehearsal with or without videotaping or pre-recording on any day prior to date of broadcast or date of broadcast or date of completion of videotaping - If more than one (1) hour (excluding a meal period of not in excess of one (1) hour) elapses between the end of any sessions and the beginning of the following session on the same day, a minimum of two (2) consecutive hours will be paid for such second session, provided that payment at an overtime rate will not be made, except for time actually worked for which the Musician is otherwise entitled to overtime pay.  This provision does not apply if either of the sessions contains no actual rehearsal or pre-recording services but is entirely limited to the use of tapes or records without the orchestra being present.

   (d)   Rehearsal on the day of live broadcast of completion of videotaping.

A.    **Basic Rates Continued**

**Variety Show (not including strip variety show)**

**For a one-half (½) hour show** — a minimum of two (2) hours rehearsal plus actual time consumed in taping or air within a five (5) hour span.  These hours need not be consecutive.  For all time elapsed beyond five (5) hours — fifty percent (50%) of the time (excluding a meal period of not in excess of one (1) hour) will be consumed by rehearsal and/or taping-air time, in minimum one (1) hour calls except where a call is contiguous to rehearsal, air or taping.

**One (1) hour show** — a minimum of four (4) hours rehearsal plus actual time consumed in taping or air within an eight (8) hour span.  These hours need not be consecutive.  For all time elapsed beyond eight (8) hours — fifty percent (50%) of the time (excluding a meal period of not in excess of one (1) hour) will be consumed by rehearsal and/or taping-air time, in minimum one (1) hour calls except where a call is contiguous to rehearsal, air or taping.

**One and one-half (1½) hour show** — a minimum of six (6) hours rehearsal plus actual time consumed in taping or air, spread over any number of days provided that on the day of air (live) or on the last day of taping, there will be a minimum of four (4) hours rehearsal plus actual time consumed in taping or air within an eight (8) hour span.  These hours need not be consecutive.  For all time elapsed beyond eight (8) hours — fifty percent (50%) of the time (excluding a meal period of not in excess of one (1) hour) will be consumed by rehearsal and/or taping-air time in minimum one (1) hour calls except where a call is contiguous to rehearsal, air or taping.

**Two (2) hour show** — a minimum of eight (8) hours rehearsal plus actual time consumed in taping or air, spread over any number of days, provided that on the day of air (live) or on the last day of taping, there will be a minimum of four (4) hours rehearsal plus actual time consumed in taping or air within an eight (8) hour span.  These hours need not be consecutive.  For all time elapsed beyond eight (8) hours — fifty percent (50%) of the time (excluding a meal period of not in excess of one (1) hour) will be consumed by rehearsal and/or taping-air time in minimum one (1) hour calls except where a call is contiguous to rehearsal, air or taping.

7.    **Radio Simulcasts**
When live programs are simultaneously broadcast over radio and television (simulcast), the Musicians performing on each such simulcast, in addition to the television payment, shall be paid on a one-half (½) hour program, $29.15; on a one (1) hour program, $38.50; and on any longer programs, $9.35 for each additional one-half (½) hour.

B.    **CONTRACTOR**

(1)    When an orchestra consists of six (6) or less playing Musicians, Contractor shall not be required. When an orchestra consists of from seven (7) to fourteen (14) Musicians, either a playing or non-playing Contractor shall be employed and shall be paid as follows:

non-playing contractor — 150% of applicable scale

playing contractor — 200% of applicable scale

When an orchestra consists of fifteen (15) or more Musicians (including the Leader), a non-playing Contractor shall be required and shall be paid the rate of 200% of the applicable sidemusician rate.

(2)   When, in accordance with the collective bargaining agreement, a Contractor is required, he/she shall be responsible for the following functions:*

(a)   Obtain all pertinent information on the production from the Producer;

(b)   Confirm signatory status and report session to the Local in whose jurisdiction the work is to be performed prior to putting out the call to the musicians;

(c)   Put out the call to the musicians and include all pertinent information regarding the session;

(d)   Be present at all sessions at all reasonable times;

(e)(i)   If necessary, collect W-4's, I-9's, as well as all information required to be entered onto the B Report Form.

(ii)   Fill out completely the appropriate B Report Form in accordance with the instruction sheet jointly approved by the Federation and Industry for each category (original session, re-use, foreign, Supplemental Market, etc.) and then immediately submit it with all invoices, W-4's and I-9's to the Producer for payment.

(iii)   File a copy of the completed B Report Form with the Local in the jurisdiction of which the services took place within 48 hours of the session.

*   When a Contractor is not required, the Leader is responsible for all of the duties outlined in 2(a) through (e)(iii).

## C.   DOUBLING

Twenty-five percent (25%) extra for the first double, and ten percent (10%) extra for each additional double, applied as set forth below.

The following are NOT construed as doubling:

Piano and Celeste, when latter is furnished.

Drummer's regulation outfit (consisting of Bass Drum, Snare Drum, Pedal, Cymbals, Gongs, Wood Blocks, Small Traps and Bells).

The percentage extra listed above shall be applied as follows:

**Variety Programs (Other Than Strip Variety):**

(a)   One-half (½) hour program — the air rate plus four (4) hours of rehearsal.

(b)   One (1) hour program — the air rate plus eight (8) hours of rehearsal.

(c)   One and one-half (1½) hour program — the air rate plus twelve (12) hours of rehearsal.

(d)   For each fifteen (15) minutes beyond one and one-half (1½) hours — the air rate plus two (2) hours of rehearsal.

**Other Programs (Including Strip Variety):**

(a)   One-half (½) hour program — the air rate plus actual rehearsal used but in no event more than four (4) hours of rehearsal.

(b)   One (1) hour program — the air rate plus actual rehearsal used but in no event more than eight (8) hours of rehearsal.

(c)   One and one-half (1½) hour program — the air rate plus actual rehearsal used but in no event more than twelve (12) hours of rehearsal.

(d)   For each additional fifteen (15) minutes in excess of one and one-half (1½) hours — the air rate plus actual rehearsal used but in no event greater than two (2) hours for each fifteen (15) minutes.

The doubling fees shall be paid for each additional instrument requiring a doubling fee that the Musician is directed to bring to the engagement, whether or not used.

If, in addition to the normal sound of an instrument, an electronic device (i.e., multiplex, divider, maestro, multiplier of octaves) is used to simulate other instrumental sounds, such use shall be construed as a double.

## D.   CARTAGE

Whenever the Producer requests a Musician to bring a heavy instrument to a recording session, the Producer shall specify whether the Musician shall transport such heavy instrument either by public or private transportation and public transportation shall be used if it is the only practicable manner of transportation.  If a public carrier is to be used, the Producer shall have the option of designating the public carrier which shall be qualified to transport musical instruments.  If the instrument is delivered by the designated public carrier, the Producer shall pay the cartage bill of the designated public carrier.  If the Musician chooses to use a carrier other than that designated by the Producer, the Producer shall not be liable for a cartage bill greater than the rate charged by the designated carrier.  If private transportation is used, the Producer will pay Musician cartage fees as follows:

| | |
|---|---|
| Harp, Electric Piano | $30.00 |
| Tympani (whole set), String-Bass, Tuba, Drums, Amplifiers, Baritone Saxophone, Bass Saxophone, Cello, Contra Bass Clarinet and Contra Bassoon | $6.00 each |

## E.   HEALTH AND WELFARE FUND CONTRIBUTION

The Company will contribute to any existing lawful Health and Welfare Fund of any Federation Local and commencing thirty (30) days after notice in writing to any such lawful Fund as may be established hereafter by any other Federation Local, the sum of $22.00 per day effective January 27, 2013; $24.00 per day effective January 26, 2014; and $25.00 per day effective January 25, 2015, for work performed within the jurisdiction of such Federation local by each Arranger, Orchestrator, and Copyist covered by this Agreement.

(a)     With respect to musicians who are members of Federation Locals 47 (Los Angeles), 802 (New York), 368 (Reno), 369 (Las Vegas) or 661-708 (Atlantic City) and any other Local which hereafter establishes a Health and Welfare Plan and notifies Industry, Health and Welfare payments for musicians rendering services under this Agreement shall be sent to the plan of the local union in which the individual musician is a member, regardless of the place where the musician performed the services.  In such case, such payment shall be expressly contingent on the information set forth on the B Report Form as to the member's local affiliation.

(b)     With respect to all other musicians, Health and Welfare payment for musicians rendering services under this Agreement shall be paid to each musician, regardless of the place where the musician performed the service.

(c)     No such Health and Welfare Fund contribution, whether paid to any Fund or paid directly to a Musician, shall be the basis for computing the applicable AFM-EP contribution or any other payments under this Agreement such as doubling, overtime, premium time pay, etc.

(d)     Payments will be made simultaneously with Musicians' wage scales.

## F.     MULTIPLE PARTS

When a Musician plays multiple parts for purposes of overdubbing, as distinguished from doubles and the playing of those instruments comprising the exceptions to the doubling provision, he will be paid the total payments that would have been made if different Musicians had been used for each part.

## G.   PREMIUM PAY

(i)     For all work performed beyond an eight (8) hour time spread in any day, between the hours of 8:00 a.m. and 12:00 midnight, payment shall be at the rate of time and one-half (150%), computed in fifteen (15) minute segments.

(ii)    For all work between 12:00 midnight and 8:00 a.m., payment shall be at the rate of time and one-half (150%) computed in fifteen (15) minute segments.

(iii)   For all work beyond an eight (8) hour time spread on any day between the hours of 12:00 midnight and 8:00 a.m., payments shall be at the rate of double time (200%) computed in fifteen (15) minute segments.

(iv)    For all work performed on any of the following holidays, double time (200%) of the basic session and overtime rates shall be paid:

|   In the United States   |   In Canada   |
|---|---|
| New Year's Day | New Year's Day |
| Presidents' Day | Good Friday |
| Memorial Day | Labour Day |
| Labor Day | Dominion Day |
| Thanksgiving | Christmas |
| Christmas | |

Each of these holidays shall be observed on the day on which it is observed by employees of the United States Government or of the Government of Canada.

## H.   MEAL PERIODS

Any Instrumentalist who is required to work more than six (6) consecutive hours without a meal break of at least one (1) hour shall be paid a penalty as follows:

If the meal break is not given immediately after six (6) hours, a penalty shall be imposed equal to two (2) hours at the applicable rehearsal rate, plus one-half (½) hour at the straight time rehearsal rate for each additional one-half (½) hour delay.

## I.     REST PERIOD

Intermission of ten (10) minutes per hour away from stand shall be given on all engagements (i.e., ten (10) minutes from the time Musicians leave stands until they return and are ready to play).  There shall be no combination of more than two (2) rest periods.  No rest period will be given within the first thirty (30) minutes after the commencement of a session, provided that all Musicians who are to participate in the session are present at the commencement of the session.

Except in the case of taping live or airing live, a penalty of fifty percent (50%) of the applicable rehearsal rate shall be imposed for the period commencing when the Musicians were initially entitled to a rest period, as provided above (i.e., after two (2) hours in the chair plus a five (5) minute grace period), and continuing until such time as the Musicians are released for a rest period for the requisite amount of time.  Penalties shall be imposed in fifteen (15) minute increments.

## J.   USE OF PRE-RECORDINGS AND PHONOGRAPH RECORDS AT REHEARSALS

(1)   If pre-recordings, which are made by Instrumentalists and Leaders employed hereunder, are used at rehearsals within the jurisdiction of the Local where the pre-recordings of a videotape program were made, such Instrumentalists and Leaders shall be deemed present at such rehearsals and shall be paid in accordance with the applicable scale wage and conditions prescribed by this Agreement during such rehearsals while such pre-recordings are in use, without being required to perform other services during such period.

(2)   For each day the pre-recordings are used at rehearsals outside the jurisdiction of the Local where the pre-recordings were made, members of the orchestra making the pre-recordings will be paid four (4) hours rehearsal pay.   Company will provide Contractor and/or Leader with all on-location production schedules.

(3)   If a commercial phonograph record is used in the studio at rehearsals of a program, the Instrumentalists and Leaders employed hereunder for such program shall be deemed present at such rehearsals and shall be paid in accordance with the applicable scale and conditions prescribed by this Agreement during such rehearsals while such phonograph records are in use, without being required to perform other services during such period.

(4)   <u>Optional Needle Drop Formula</u>.   In lieu of J(1) above with respect to weekly variety shows and variety specials (but not for bank acts), the Producer at its option may utilize the following formula:

   (a)   The basic scale for pre-recording under this formula will be $226.85 effective 1/27/13, $231.40 effective 1/26/14, $236.00 effective 1/25/15, per hour with a minimum three-hour session.   The Premium Pay provisions of G(i)-(iv) shall apply.

   (b)   The pre-recordings so made will be available for unlimited use by the Producer on the program for which they were made.

   (c)   If an orchestra is used "live" or as the program is being videotaped (hereinafter referred to as "in-studio work"), it must be the same orchestra as did the pre-recording and it will be paid for in-studio work at the regular rates for the program.   However, if such orchestra overdubs a pre-recording while performing in-studio, it will be paid at the special pre-recording rate ($226.85 effective 1/27/13, $231.40 effective 1/26/14, $236.00 effective 1/25/15, per hour). If no in-studio work is performed, the minimum number of hours of pre-recording for a half-hour (½) program will be three (3) hours, for a one (1) hour program will be six (6) hours, and for a ninety (90) minute program will be nine (9) hours.

   (d)   The meal period penalty shall be based on the regular rehearsal rate.

   (e)   Doubles shall be paid an additional $226.85 effective 1/27/13, $231.40 effective 1/26/14, $236.05 effective 1/25/15, for the first double, and $90.70 effective 1/27/13, $92.50 effective 1/26/14, $94.35 effective 1/25/15, for each additional double, regardless of the number of hours of doubling.

   (f)   The company must notify the Federation, through the local union and by copy to the Federation prior to the first musician call for the first session to be produced pursuant to this option.

## K.   MAKE-UP AND COSTUMING

| For make-up and/or costuming | $20.00 |
|---|---|

In no event shall Musicians be called in for make-up or costuming more than one (1) hour prior to rehearsal or recording, so that the makeup and/or costuming time shall immediately precede such rehearsal or recording.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

**L.    ADVANCE NOTICE OF REHEARSAL**

(1)    The Contractor or Leader shall be furnished with a rehearsal schedule at least twenty-four (24) hours before the first rehearsal for a program, except where broadcast or studio schedules cannot be determined due to unanticipated developments.  In addition, the Contractor or Leader shall be furnished with a copy of the engineering schedule or equivalent information.

(2)    Musicians will be notified prior to first day of rehearsal the starting and finishing time of each day's call.  On any day prior to final day of taping, the finishing time cannot be extended beyond one (1) hour without the Musician being free to leave the engagement without being disciplined.

(3)    For specials (i.e., all shows other than strips or weekly series shows), the starting time of a call for a day of air (live) or the last day of taping may not be changed (i.e., delayed or advanced) after 12:00 noon of the prior day, if the change is for more than two (2) hours.  On all other rehearsal days, no such change of more than two (2) hours may be made prior to 12:00 noon of the second prior day.

(4)    For all strips and weekly series shows, the starting time of a call for a day of air (live) or the last day of taping may not be changed (i.e., delayed or advanced) after 6:00 p.m. of the prior day, if the change is for more than two (2) hours.  On all other rehearsal days, no such change of more than two (2) hours may be made prior to 6:00 p.m. of the second prior day.

**M.    CANCELLATION OF ENGAGEMENTS**

An engagement once called shall not be canceled or postponed less than four (4) days prior to the date of the call.  In the event of an emergency, an engagement may be canceled or postponed upon shorter notice with the consent of the Office of the President of the Federation.

**N.    BANK ACTS**

(1)    The Federation will be given notice, by the company, of all bank act sessions (i.e., an act made for a program other than the one for which the Musician was engaged).  The company will also give notice to the Federation of the program in which the bank act is broadcast.

(2)    Bank Acts will be made for a particular program series and cannot be used in a Variety Special show.

(3)    There must be a live orchestra engaged on every show in which bank acts are to be exhibited.

(4)    Musicians performing on a bank act shall be paid for the actual hours worked on such bank act and in addition, for a three (3) hour minimum call.

(5)    Musicians who perform on a bank act shall be paid for the actual hours worked on such bank act and exhibited, and will additionally receive the air rate for the program, plus an amount to equal the minimum guaranteed rehearsal hours applicable to said program.

(6)    Reuse payments for Musicians who perform on a bank act and are not engaged for the program in which the bank act is exhibited, shall be based on the air rate, plus minimum rehearsal hours required for such program.

(7)    Reuse payments for Arrangers, Orchestrators and Copyists who prepare music for a bank act shall be based on actual wages earned at scale, but in no event, shall an Arranger or Orchestrator receive more than that of the Leader, nor a Copyist receive more than that of an Instrumentalist.

**O.    RUN OF SHOW GUARANTEE**

An Instrumentalist who is engaged to perform on a weekly variety show and who is retained on such show for a period of more than two (2) consecutive shows, and an Instrumentalist who is engaged to perform on a strip variety show and who is retained on such show for a period of one (1) week, may not be replaced

without his/her consent by another Instrumentalist who is to play the same basic instrument on that show, except for just cause, or at the end of any thirteen (13) week cycle of that show. This commitment shall be reciprocal, and therefore, if any such Instrumentalist fails to appear personally for a session for which he/she has been called, except with the prior consent of the Leader or Contractor and the Producer, he/she shall no longer be entitled to the protection of this clause. Such consent shall not be necessary when failure to appear is beyond the control of the Instrumentalist. On strip variety shows, the protection of this section does not apply to those Instrumentalists who augment or play in the orchestra when the show goes out of town, and those Instrumentalists at home that may not go out of town are protected when the show returns home.

## P.   LATE PAYMENT PENALTIES

Payment is due within fifteen (15) business days. If the company fails to pay any Musician covered by this Agreement within the time periods established by same, the following schedule of late penalty payments shall apply:

(a)   A penalty of five percent (5%) of the above mentioned amount due and unpaid if the delinquent payment is made within five (5) days (excluding Saturday, Sunday and holidays) after payment was due.

(b)   A penalty of seven and one-half percent (7½%) of the above mentioned amount due and unpaid (excluding the penalty in (a) above) if the delinquent payment is made between the sixth and tenth business days (excluding Saturdays, Sundays and holidays) after payment was due.

(c)   A penalty of ten percent (10%) of the above mentioned amount due and unpaid (excluding the penalties in (a) and (b) above) if the delinquent payment is made between the eleventh and fifteenth business days (excluding Saturdays, Sundays and holidays) after payment was due.

(d)   A penalty of fifteen percent (15%) of the above mentioned amount due and unpaid (excluding the penalties in (a), (b), and (c) above) if the delinquent payment is made between the 16th and 30th business days (excluding Saturdays, Sundays and holidays) after payment was due.

(e)   A penalty of twenty-five percent (25%) of the above mentioned amount due and unpaid (excluding the penalties in (a), (b), (c), and (d) above) if the delinquent payment is made between the 31st and 50th business days (excluding Saturdays, Sundays and holidays) after the payment was due.

(f)   Payments made after such fiftieth (50th) business day shall require, in lieu of the said additional twenty-five percent (25%) payment, the payment of an additional amount equal to fifty-five percent (55%) of the initial amount payable, plus an additional ten percent (10%) payment for each thirty (30) days after the 50th day in which payment is not made. Such fifty-five (55%) and ten percent (10%) payments shall not be required unless written notice has been given (which may not be given before the 31st day after the date of receipt of their completed billings and all necessary and completed W-4 forms) that the employer is delinquent and the employer has not made the payment within fifteen (15) business days after receipt of such notice.

(g)   The above delinquent payment penalties shall not apply to payments which have not been made by the Company by reason of:

(i)   A bona fide dispute as to the amount due and payable notice of which shall be filed within five (5) business days following receipt of bills with the local of the Federation in whose jurisdiction the work was performed.

(ii)   Emergencies beyond the control of the Company.

(iii)   Where the Company inadvertently makes a less than full payment and presentation of the claim for the remainder is deliberately delayed in an attempt to collect a penalty.

(iv)   Where the delay is due to the failure of a Musician to return a W-4 form or to the failure of the Contractor (or Leader) to submit completed AFM Contract forms to the Company.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

**Q.   SCORING FOR DAYTIME SERIALS AND STRIP GAME SHOWS**
   (Other than music shows and those strip game shows not produced under this Agreement as of 5/31/86)

The following rules shall apply where music is scored for a daytime serial or strip game show:

(1)   **Annual Commitment**

   For each daytime serial, the Company shall expend no less than $32,500 per annum for covered musical services at the minimum scale set forth below, provided:

   (a)   That where an Instrumentalist or Instrumentalists had been used during the prior Agreement, the annual cost of musical services covered by this Agreement on such series will not be reduced during the term hereof, and

   (b)   That on shows scored under the 1974-76 Agreement, the annual commitment will be equal to the first year's Musicians scoring cost if greater than $32,500, unless, in either case, the show terminates before the end of the term of this Agreement. (We shall furnish the Federation with said costs, if any.)

(2)   **Minimum Scoring Hours**

   (a)   **Daytime Serials** — The minimum scoring hours for a show which is first scored under this Agreement will be eighteen (18) hours per twenty-six (26) weeks for the first year of scoring. Thereafter there is no commitment of scoring hours for a particular show provided that at least $8,500 will be spent each year on new scoring for that show. Such amount may be applied against the annual commitment referred to in (1) above.

   (b)   **Strip Game Shows** — There shall be at least fifteen (15) scoring hours for each twenty-six (26) weeks.

(3)   **Period of Use**

   (a)   **Daytime Serials** — Music scored for a daytime serial can be utilized in any episode of that serial that is produced within one (1) year after the music is scored, provided that the conditions set forth in (1) and (2) above, continue to be met. Music from any scoring session recorded hereunder or under the provisions of Exhibit I, Paragraph Q, of the prior Agreement, may continue to be used after the expiration of the period of one (1) year referred to in the first sentence hereof, upon payment of: forty percent (40%) for the second year; thirty-five percent (35%) for the third year; thirty percent (30%) for the fourth year; twenty-five percent (25%) for the fifth year; twenty percent (20%) for the sixth year; fifteen percent (15%) for the seventh year and each subsequent year of use of that session's earnings to the Musicians involved. This right shall exist at least until the end of this Agreement or the completion thereafter of any annual period for any program with respect to which the annual $32,500 guarantee has been paid. The annual reuse fees are also creditable against such guarantee.

   (b)   **Strip Game Shows** — Music scored for such series can be utilized in any episode that is produced within one (1) year after the music is scored, provided the conditions set forth in (2)(b) continue to be met.

(4)   The minimum scale shall be $239.95 effective January 27, 2013, $244.75 effective January 26, 2014, and $249.65 effective January 25, 2015 per Sidemusician for a minimum session of three (3) hours. Related overtime shall be on a pro rata basis for each additional fifteen (15) minutes or fraction thereof. For Leaders and Contractors, the minimum scale shall be as required under Paragraph A, of this Exhibit I. A single Musician (other than Production Musician) shall receive an additional twenty-five percent (25%) of scale.

(5)   Doubling — First double twenty-five percent (25%) of the basic scale extra and ten percent (10%) extra for each additional double.

(6)   All payments, benefits and conditions not specifically set forth in this Paragraph Q, shall be those prescribed elsewhere in this Agreement.

(7)     As used in this article, daytime includes non-primetime.

## R.   SCORING FOR NON-MUSICAL GAME SHOWS (INCLUDES STRIP GAME SHOWS)

Except for such shows being produced under this Agreement as of May 31, 1986, the following scoring requirements shall apply:

(a)     Minimum session of three (3) hours at $275.15 effective 1/27/13; $280.65 effective 1/26/14; $286.30 effective 1/25/15.

(b)     Limit of fifteen (15) minutes of recorded music for each session.

(c)     Overtime shall be on a pro rata basis for each additional fifteen (15) minutes or fraction thereof. There shall be no additional product recorded during overtime.

(d)     The original session payment includes the first twenty six (26) weeks of use.

(e)     One hundred percent (100%) of the original session fee, excluding overtime, is payable for each additional thirteen (13) week cycle.

## S.   THEME MUSIC

(1)     Themes will contain only music for program openings and closings.  There will be no bridges or cues made under this category.

(2)     Production of generic and umbrella themes are permitted under the terms of this Agreement provided, however, that if same are used as a theme for a specific program series, additional payments will be made as provided for in Paragraph S(5) of this Agreement.

(3)     Any generic or umbrella theme music used for promotional purposes shall be paid for, and governed in its use, according to the terms and conditions of the applicable AFM Television and Radio Commercial Announcements Agreement.

(4)     The amount of finished music product made in a theme session, including units of related overtime, cannot exceed three (3) minutes in length.

(5)     The minimum scales shall be $244.60 effective 1/27/13; $249.50 effective 1/26/14; $254.50 effective 1/25/15, per Sidemusician for a minimum session of three (3) hours.  Related overtime shall be $20.40 effective 1/27/13; $20.80 effective 1/26/14; $21.20 effective 1/25/15, for each additional fifteen (15) minutes or fraction thereof.  For Leaders and Contractors, the minimum scale shall be as required under Paragraph A, of this Exhibit I.  A single Musician (other than Production Musician) shall receive an additional twenty-five percent (25%) of scale.

  (a)   Doubling — First double twenty-five percent (25%) of the basic scale extra and ten percent (10%) extra for each additional double.

  (b)   All payments, benefits and conditions not specifically set forth in this Paragraph S, shall be those prescribe elsewhere in this Agreement.

(6)     Theme music may be utilized for twenty-six (26) weeks on a program series engaging live Musicians for each episode and, except for prime time programs, thirteen (13) weeks when no live Musicians are engaged; provided that, on a program series in the category of news, commentary, public affairs and religious shows such theme music may, in any event, be utilized for twenty-six (26) weeks, and on sports show series such theme music may be utilized for a particular sports season.

(7)     Theme music utilized beyond the cycles outlined in Paragraph (6) above, will require a one hundred percent (100%) repayment to each Musician, Arranger, Orchestrator and Copyist involved in the original production.  Theme music produced after November 1, 1989 and utilized beyond the cycles outlined in Paragraph (6) above, will require a seventy-five percent (75%) repayment to each Musician, Arranger, Orchestrator and Copyist involved in the original production.

(8)     Except for 13-week cycle themes, and generic, or umbrella theme music used for promotional purposes, a producer may elect to pay for theme music in the manner set forth below instead of in accordance with (6) and (7) above.

(a)  The producer may make an upfront payment for an initial 52-week cycle of one hundred fifty percent (150%) of scale, provided that such payment is made within twenty (20) business days of release.  If the producer fails to make the payment within that time limit, the producer will forfeit the right to utilize this optional formula, will be subject to applicable late payment penalties, and will be entitled to take a credit against any subsequent cycle payment for any overpayment made.

(b)  A producer may elect upfront payments for subsequent 52-week cycles of one hundred thirty-five percent (135%) of scale, provided that such payment is made within twenty (20) business days of release.  If the producer fails to make the payment within that time limit, the produce will forfeit the right to utilize this optional formula, will also be subject to applicable late payment penalties, and will be entitled to a credit against any subsequent cycle payment for any overpayment made.

c)  At the end of any cycle, a producer may elect to utilize the formula in (b) for any subsequent 52-week cycle of any theme music produced under this Agreement or any prior AFM TV Videotape Agreement.

**T.   SPLITTING OF ORCHESTRA**

The company will not be permitted to split an orchestra engaged for any program produced under the terms of this Agreement except for use of:

(a)  Self-contained groups;

(b)  Guest conductors and featured instrumentalists accompanying guest artists;

(c)  Orchestras from a city other than that from where the program is being produced when called upon to perform for a single segment production number;

(d)  Instrumentalists called to augment the basic orchestra as required by program featured artists; and

(e)  Production drummers as defined in Exhibit II, Paragraph B, herein.

(f)  No Splitting of the Orchestra payments will be owed to any musicians who are members of a house band engaged on a program if a house band is engaged on such program for at least thirteen (13) weeks of its broadcast season or for its initial broadcast season.  In no event can a broadcast season be more than fifty-two (52) weeks.

**U.   MUSIC SOUND CONSULTANT**

If a Musician is engaged to perform services in the booth in assisting or advising the Producer or Sound Technician during the taping of a program as to the musical sound quality being recorded, he/she shall be paid at the rate of $75.55 effective 1/27/13; $77.05 effective 1/26/14; $78.60 effective 1/25/15, for each hour he/she so performs, or for such work in excess of eight (8) hours in any day, at time and one-half (1½) such rate; and upon a second or subsequent showing of the program as provided in Article 8, he/she shall receive the percentages of such scale payments provided for in said Article 8.  Such amounts may be credited against any overscale payments for musical services hereunder.  The Leader or Contractor on that program may not also serve in this capacity.

**V.   ELECTRONIC MUSICAL INSTRUMENTS**

(a)  A person who, in exercising musical skills, utilizes a synthesizer or other electronic device to produce music is a musician within the meaning of this Agreement.  It is recognized that complex sequencing which is required by the Producer prior to a scoring session in order to prepare for the performance constitutes musical services rendered by the musician who performs such services utilizing musical skills.

At the time a musician is initially engaged, he/she shall be advised whether the multi-tracking rate set forth in (b) below or the real time rate shall apply to the scoring session.

(b)    At the election of the Producer, a musician who is employed to play an electronic musical device(s) shall be paid at the following hourly rates (herein referred to as "multi-tracking rates") for programs covered by this Agreement as set forth below:

    (1)    $302.30/hr. effective 1/27/13; $308.35/hr. effective 1/26/14; $314.50/hr. effective 1/25/15, if one (1) musician is employed under the multi-tracking rates.

    (2)    $264.50/hr. effective 1/27/13; $269.80/hr. effective 1/26/14; $275.20/hr. effective 1/25/15, if two (2) or more musicians are employed under the multi-tracking rates.

The foregoing rates include all electronic and acoustical doubles and all overdubs.  With respect to each session, Producer shall have the right to designate whether such musician is to be paid under the "real-time" rates or at the multi-tracking rates.

The musician(s) employed under this Paragraph V(b) shall be paid for a minimum of three (3) hours.

**Theme:**
In the event theme music is recorded under this provision, all terms and conditions of Paragraph S (Theme Music) will be applicable, with the exception of Paragraph S(5) dealing with minimum scales.

**Daytime Serials:**
If the music recorded under this provision is for a daytime serial, the amount of finished music that may be recorded in a session shall be one (1) minute for each hour of the session.  All terms and conditions of Paragraph Q shall be applicable, with the exception of Paragraphs Q(4) and (5).

**Scope:**
The foregoing rates and conditions, including those for theme music, may not be utilized in the production of variety programs (including, for purposes of this paragraph only, strip variety programs) and award shows.

**General:  All other terms and conditions of this Agreement will remain in effect.**


**W.   USE OF MUSIC IN NEWS AND MAGAZINE PROGRAMS**

(a)    Music in a news or magazine piece can only be used with the picture in connection with which it was originally recorded.

(b)    In respect to the use of musical performances in the course of broadcasting news stories, the parties will, as in the past, deal with these on a case-by-case basis, except as provided in (c).

(c)(1)    Where music taken from another type of performance or rehearsal therefore is recorded on location for a magazine-type program (such as "60 Minutes," "20-20," "American Almanac" or "West 57th") and the music utilized in any one (1) segment exceeds two (2) minutes, payment will be made to the Musicians involved (including music preparation Musicians) at the "Other Programs" one-half (½) hour air rate.  This provision shall not require payment in situations where the music picked up is either; (i) not directly related to the story being covered and part of the general background, or (ii) part of events such as parades, sports events or other public spectacles.

    (2)    We agree to give the Federation prior notice of any recordings scheduled to take place for magazine shows and also agree not to tape complete performances.

(d)    For news or public affairs programs of more than sixty (60) minutes (e.g., "Today," "Good Morning America," and "CBS Morning News"), the Producer shall pay Musicians engaged to play such programs the one (1) hour "other" program rate.

(e)    This will confirm the practice that on Network morning news programs, e.g., "Good Morning America," "Today" and "The Early Show," musicians paid pursuant to Exhibit I W(d) are not entitled to premium pay under Exhibit I(G) or Exhibit II(A).

## X.   INCOMPLETE TRACKS

1.   Where self-contained groups appear on a program, phonograph recordings which they have made (including but not limited to incomplete tracks of such recordings) may be used by them without restriction or additional payment beyond the rates for the television broadcast itself.

2.   Where incomplete tracks are used in situations not involving self-contained groups, the following payments will be required:

   a.   to the recording and music preparation musicians who made the original recording, the air rate plus minimum guaranteed rehearsal;

   b.   to the "in-studio" orchestra, an additional two (2) hours' rehearsal pay for the first track used and one (1) additional hour for each additional track; provided, however, that the additional rehearsal pay obligation shall not apply in circumstances where the unique musical sounds produced by a group cannot effectively be reproduced by the "in-studio" orchestra.

3.   Where a self-contained group uses a track which contains Musicians other than the group itself, payments in accordance with Subparagraph (2) shall be made except that the group itself shall be treated under Subparagraph (1).

## Y.   TRAVEL

If the Company requires a Musician to travel out of town, the Company will reimburse such Musician for all reasonable and necessary travel expenses, including cost of hotel if the Musician is required to stay overnight.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

# EXHIBIT II:  BASIC RATES FOR PRODUCTION MUSICIANS

## A.   HOURLY EMPLOYMENT

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| A minimum call of two (2) hours, rate per hour | $75.55 | $77.05 | $78.60 |

### PREMIUM PAY

(i)     For all work performed beyond an eight (8) hour time spread in any day, between the hours of 8:00 a.m. and 12:00 midnight, payment shall be at time and one-half (150%) of the hourly rehearsal rate computed in fifteen (15) minute segments.

(ii)    For all work between 12:00 midnight and 8:00 a.m., payment shall be at time and one-half (150%) of the hourly rehearsal rate computed in fifteen (15) minute segments.

(iii)   For all work beyond an eight (8) hour time spread on any day between the hours of 12:00 midnight and 8:00 a.m., payment shall be double (200%) the hourly rehearsal rate computed in fifteen (15) minute segments.

(iv)    For all work performed on any of the following holidays two hundred percent (200%) of the basic session and overtime rates shall be paid:

| In the United States | In Canada |
|---|---|
| New Year's Day | New Year's Day |
| Presidents' Day | Good Friday |
| Memorial Day | Labour Day |
| Labor Day | Dominion Day |
| Thanksgiving | Christmas |
| Christmas | |

Each of these holidays shall be observed on the day on which it is observed by employees of the United States Government or of the Government of Canada.

## B.   PRODUCTION MUSICIANS

Whenever the musical services of the Production Musicians are recorded or videotaped, they will subsequently be considered an integral part of the program orchestra, thus invoking the provisions of Exhibit I, Paragraph T, of this Agreement.  However, the services of a production drummer who is not a member of the program orchestra may be recorded or videotaped with the program orchestra in those production numbers which such drummer had rehearsed during preproduction without involving the provisions of Exhibit I, Paragraph T.  For such services, the production drummer shall receive payment for all hours worked, but in no event, less than the applicable air rate plus guaranteed rehearsal, but the orchestra drummer rather than the production drummer shall be covered by Paragraph J (Needle Drop) with respect to use of that recording at rehearsals.

Production Musicians may also be employed as members of the program orchestra and it is therefore recognized that musical services for Production Musicians and those of the program orchestra are two (2) separate services.

Production Musicians hours not devoted to recording and/or videotaping do not invoke Exhibit I, Paragraph T.

# EXHIBIT III:  MUSIC PREPARATION SERVICES

Arrangers, Orchestrators and Copyists shall be paid not less than the rates set forth below and the conditions set forth shall apply:

**A.    Arrangers**

(1)    Definition — Arranging is the art of preparing and adapting an already written composition for presentation in other than its original form.   An arrangement shall include reharmonization, paraphrasing and/or development of a composition so that it fully represents the melodic, harmonic and rhythmic structure and requires no changes or additions.

(2)    Minimum Rates — Since arranging represents highly individual skills, the wages paid for arranging are left to the discretion of the person doing the work, provided, however, that the wages shall never be less than provided for in Paragraph B.

(3)    Credits — On any program where the Leader receives name credit, Arrangers and Orchestrators performing services on said show shall receive similar name credit.

**B.    Orchestrators**

(1)    **Definition** — Orchestrating is the labor of scoring the various voices and/or instruments of an arrangement without changing or adding to the melodies, counter-melodies, harmonies and rhythms.

(2)    **Time Rates for Orchestrators**

| | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| May be used only on adjustments, work at rehearsals, take down, alterations, additions and in other situations where page rates are impractical. The hourly rates for time work shall be: | $43.46 | $44.33 | $45.22 |

(3)    **Page rates for Orchestrators [subject to the rules of Paragraph B(4)]:**

| | | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|---|
| (a) | *For not more than ten (10) lines per score page:* | | | |
| | (i)    Orchestrating an arrangement per page | $28.97 | $29.55 | $30.14 |
| | (ii)    Revoicing a score | $12.75 | $13.01 | $13.27 |
| (b) | For each additional single line part in excess of ten (10) parts per score page | $1.11 | $1.14 | $1.16 |
| (c) | For adding lines to a score already orchestrated (other than revoicing a score) when performed by the original Orchestrator, per score page, per line.  Any other Orchestrator will be paid in accordance with (a)(ii) above | $1.42 | $1.45 | $1.48 |

|  |  | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|---|
| (d) | For adding piano part, per score page | $2.93 | $2.99 | $3.05 |
| (e) | Orchestrating the part (without score) | The combined rate for orchestrating & copying | | |
| (f) | For taking down a lead from voice, instrument or mechanical device including symbols (single line); each 4 bar unit | $7.25 | $7.39 | $7.54 |
| (g) | For scoring a two (2) line or three (3) line piano conductor part from an orchestra score: | | | |
|  | each 4 bar unit (2 lines) | $13.46 | $13.73 | $14.00 |
|  | each 4 bar unit (3 lines) | $17.87 | $18.23 | $18.59 |
| (h) | For scoring for solo piano, harp, accordion, etc., for individual performances; each 4 bar unit (2 lines) | $13.46 | $13.73 | $14.00 |
| (i) | For scoring for (choral) voices (a page to consist of not more than four voices, which may include a piano part), with come sopras being paid for | $12.53 | $12.78 | $13.03 |
|  | each additional voice | $1.11 | $1.14 | $1.16 |

The following rules shall apply to page rates:

(a)   A score page consists of four (4) bars and shall be computed on the basis of a minimum of ten (10) lines.

(b)   Double staff and divisi parts shall count as two (2) lines.

(c)   A pick-up shall be computed as a full bar.

(d)   Coma sopras shall be paid for.

(e)   Repeats shall not be used within a chorus to reduce the wage paid (but repeats, dal segnos and the like, which appear in the composition are permissible).

(f)   Rates shall be computed on page and half-page rates, except that the first page shall be paid in full rather than pro rated.

(g)   The page rates do not include proofreading service.

(h)   Voice and conductor parts written into a score, except those covered in B(3)(i), shall be treated as instrumental parts.

(i)   The word "piano" shall be deemed to include organ, harp, celeste, harpsichord, accordion, cimbalom, etc., when written on two (2) staves.

    (4)    **Transcriptions**

Payment for exact transcription of all parts of a composition from a mechanical device and recreating the orchestration:

One hundred fifty percent (150%) of the applicable orchestration scale per score page.

**C.   Copyists**

(1)    **Applicability** — The minimum rates set forth in this Section C shall apply as follows.

(2)    **Times Rates for Copyists** — May be used only on pasting, cutting, production lines, and in other situations where page rates are impractical.

|  | **1/27/13** | **1/26/14** | **1/25/15** |
|---|---|---|---|
| The hourly rate for time work shall be | $26.11 | $26.63 | $27.15 |

### PAGE RATES FOR COPYING

Page rates for Copyists shall be as follows [subject to the rules set forth in Paragraph C(4)]:

|  |  |  | **1/27/13 B&W** | **1/26/14 B&W** | **1/25/15 B&W** |
|---|---|---|---|---|---|
| (1) | (a) | Single stave parts (single notation) | 4.73 | 4.83 | 4.92 |
|  | (b) | Single stave parts — chorded, or divisi | 9.47 | 9.66 | 9.86 |
| (2) | (a) | Double stave parts — chorded (Piano, harp, organ, celeste, etc.) | 9.47 | 9.66 | 9.86 |
|  | (b) | + vocal cue | 11.85 | 12.09 | 12.33 |
| (3) | (a) | Rhythm piano parts (chord symbols + bass line) | 7.81 | 7.96 | 8.12 |
|  | (b) | + vocal cue | 10.20 | 10.41 | 10.62 |
| (4) |  | Piano-vocal (three (3) staves with lyrics) (Piano cued & lyric rate) | 14.23 | 14.51 | 14.80 |
| (5) |  | *Lead sheet [melody + chord symbols + lyrics one (1) set] | 23.65 | 24.12 | 24.60 |

### VOCAL PARTS

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| (6) | (a) | Single voice line & lyrics (one (1) set) | 9.47 | 9.66 | 9.86 |
|  | (b) | Foreign language lyrics, extra page | 2.14 | 2.19 | 2.23 |
| (7) | (a) | *Choir parts with lyrics (one (1) set) | 20.42 | 20.83 | 21.25 |
|  | (b) | Foreign language lyrics, extra page | 3.42 | 3.48 | 3.55 |

**_*Including Multi Use Parts_**

**Television Videotape Agreement**
**January 27, 2013 − February 2, 2016**

## CONDUCTOR PARTS

|  |  |  | 1/27/13 B&W | 1/26/14 B&W | 1/25/15 B&W |
|---|---|---|---|---|---|
| (8) | (a) | *Conductor, piano — conductor, production, control, etc. (two (2) staves only) | 26.60 | 27.14 | 27.68 |
|  | (b) | *Constructing chorded piano or conductor part (when no piano in score) | 47.93 | 48.89 | 49.86 |
|  | (c) | *Conductor's lead sheet (single stave) no words or lyrics | 18.91 | 19.29 | 19.68 |

### ADDING LYRICS OR WORDS  (per set, per page)

|  |  |  | | | |
|---|---|---|---|---|---|
| (9) | (a) | Single stave parts | 2.39 | 2.43 | 2.48 |
|  | (b) | Multiple stave parts | 2.39 | 2.43 | 2.48 |
|  | (c) | Foreign language | | Double above rates | |

### NUMBERING BARS (per page)

|  |  | | | |
|---|---|---|---|---|
| (10) | B&W: | 1.00 | 1.02 | 1.04 |
|  | Repro: | 2.00 | 2.04 | 2.08 |

### CHORD SYMBOLS (where added, per page)

|  |  |  | | | |
|---|---|---|---|---|---|
| (11) | (a) | Single parts | B&W: | 2.43 | 2.48 | 2.53 |
|  |  |  | Repro: | 4.86 | 4.96 | 5.06 |
|  | (b) | Multiple stave parts | B&W: | 1.28 | 1.31 | 1.33 |
|  |  |  | Repro: | 2.56 | 2.62 | 2.66 |

| (12) | Any part for solo performance | + 50% |
|---|---|---|
| (13) | Special routines | + 50% |
| (14) | Symphony rate | + 50% |
| (15) | Transposition | + 50% |
| (16) | Master copy for reproduction (all parts not listed) | Double part price |

***Including Multi Use Parts**

### TIME WORK

|      |     |                                                    | 1/27/13 | 1/26/14 | 1/25/15 |
|------|-----|----------------------------------------------------|---------|---------|---------|
| (17) | (a) | From 9:00 a.m. to 6:00 p.m. (straight time)        | 26.11   | 26.63   | 27.16   |
|      | (b) | From 6:00 p.m. to 9:00 a.m. (time and ½)           | 39.16   | 39.95   | 40.75   |
|      | (c) | Sundays and holidays (double time)                 | 52.21   | 53.26   | 54.32   |

### ADDING SYMBOLS
### (OTHER THAN CHORD SYMBOLS)
### FOR ELECTRONIC INSTRUMENTS OR DEVICES

|      |     |                      |      |      |      |
|------|-----|----------------------|------|------|------|
| (18) | (a) | Single stave parts   | 2.45 | 2.50 | 2.55 |
|      | (b) | Multiple stave parts | 1.34 | 1.36 | 1.39 |

The following rules shall apply to page rates:

(a)   For duplicating orchestra and band scores (note for note), the minimum rate shall be one-half (½) of the orchestrating rate for scoring same.

(b)   For remaking a score from regular parts, the minimum rate shall be one-third (1/3) of the orchestrating rate for scoring same.

(c)   Modulations, new introductions, endings and interpolations from piano shall be paid for at orchestrating rates.

(d)   Symphony, opera, cantata, oratorio, ballet or any other standard or classical music (copies, transcriptions, extractions) shall be paid for at one-half (½) more than the rates listed.

(e)   Special routine work (writing only) where two (2) or more scores or orchestral parts must be used or referred to in extracting the parts, shall be paid for at fifty percent (50%) more than the rates listed, provided that if such work requires a transposition of parts, for the parts so transposed, there shall be an extra charge of fifty percent (50%) of the listed rates.

(f)   When the services of more than one (1) Copyist are necessary to complete the work assignment, the contracting Copyist shall be designated as a Supervisor Copyist and shall be paid for such services twenty-five percent (25%) more than the listed rates for the work which he or she supervises (which will be deemed to include copying done by him or her if the additional Copyist(s) perform more than one-third (1/3) of the copying on such assignment).

(g)   When two (2) or more Copyists are required to split scores for the convenience of the Employer, each Copyist shall be paid at page and half page rates for the section copied by such Copyist, but not less than the applicable hourly rate.

(h)   Rates for copying do not include any proofreading services. Proofreading, if required by the Employer, shall be paid for at the rate of $37.76 effective 1/27/13; $38.52 effective 1/26/14; $39.29 effective 1/25/15, per hour with a two (2) hour minimum call to be applicable to such rate.

(i)   Divisi parts shall be paid for on a pro rata basis.

(j)   Editing shall be paid for at the copying rate plus fifty percent (50%).

(k)   Rates shall be computed on the basis of ten (10) stave paper except that parts requiring three (3) or more braced staves shall be written on twelve (12) stave paper, unless impractical.

(l)   Rates shall be computed on page and half-page rates, except that the first page shall be paid in full rather than prorated.

(m)  An average of four (4) bars per stave shall be secured, if possible, and two (2) staves of the first page (or any following pages, if necessary) shall be used for titles or other written items.

(n)  The Copyist who prepared the original part shall be paid the listed rate for any reproductions thereof, by any mechanical means whatsoever, except where a master copy was previously paid for at the rate listed.

(o)  All paper and necessary working material shall be supplied by the Employer or furnished by the Copyist at cost.

(p)  Transposition of all parts shall be paid for at fifty percent (50%) more than the listed rates.

(q)  Use of rehearsal letters every two (2), three (3) or four (4) bars or to circumvent payment for numbering shall not be deemed normal use.

(r)  Copying from a score in which three (3) or more parts are combined on a single stave — fifty percent (50%) additional for those parts only.

## D.  Librarians

Librarians required to do arranging, orchestrating and/or copying music shall be paid page rate, respectively, for such arranging, orchestrating and/or copying, in addition to their regular salary.

For all hours worked in excess of eight (8) in any day (excluding the meal period), time and one-half shall be paid.

For all hours worked between 12:00 midnight and 8:00 a.m., fifty percent (50%) additional to the classified rate shall be paid.

|  | 1/27/13 | 1/26/14 | 1/25/15 |
|---|---|---|---|
| Playing Librarians shall receive for their services as Librarians with minimum time, two (2) hours, per hour or fraction thereof | 41.35 | 42.18 | 43.02 |
| Non-playing Librarians shall receive for their services as Librarians a minimum for two (2) hours service or less | 134.88 | 137.58 | 140.33 |
| Overtime, above the minimum two (2) hour call, shall be paid for at rate per hour or fraction thereof | 45.05 | 45.95 | 46.87 |
| Non-playing Librarians required to work on day other than day of broadcast, per hour | 45.05 | 45.95 | 46.87 |

## E.  General rules applicable to Arrangers, Orchestrators and Copyists

(1)  The Arranger or Orchestrator shall deliver to the Copyist a full score.  A full score is a visual representation of parts to be performed by instruments and/or voice of a musical ensemble systematically placed on a series of staves, one (1) above the other, and in which no more than two (2) instruments are combined on a single staff.  Abbreviations by coma sopra and/or col indications within the same score may be used.

(2)  If arrangements, orchestrations and parts (or any portion thereof) resulting from music preparation services performed in a category other than videotaped television programs are used for such programs, a first time new use payment shall be made in full at the rate applicable hereunder, to all music preparation Musicians who rendered such original services, provided that such new use payments shall be due only if the producer was notified in writing prior to the commencement of rehearsal or sound check whichever occurs first.  The production date rather than the air date shall be used to determine which use is first.  Music first used on television for a legitimate Telethon shall not be considered as a first use on television for purposes of computing new use payment.

(3)     Arrangers, Orchestrators and Copyists shall stamp the first and last pages of all arrangements, and score and the first page of all parts with their official, union stamp.  Card number, local and year must be written on the master copy.

(4)     Minimum pay for any job assignment shall be no less than the equivalent of a four (4) hour call at the applicable hourly rate.

(5)     Orchestrators and Copyists shall receive the following premium rates:

    (a)     For work from 6:00 p.m. to 9:00 a.m., the listed rate plus one-half (½).

    (b)     For work performed on the same job at any time following a call back less than eight (8) hours after prior dismissal during premium pay hours, the listed rate plus one-half (½).

    (c)     For work in excess of eight (8) hours in one (1) day, the listed rate plus one-half.

    (d)     For work in the U.S. on Sundays and the following holidays: New Year's Day, Lincoln's Birthday, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, double the listed rate.

(6)     If the Employer requests an Orchestrator or Copyist to work in a city other than the one in which he resides or in his normal working environs in which he is customarily employed, such work shall be paid for at the listed rate plus twenty-five percent (25%).  In the case of an Orchestrator, the Employer shall guarantee a minimum of $126.83 per day effective 1/27/13; $129.37 per day effective 1/26/14; $131.96 effective 1/25/15.  In the case of a Copyist, the Employer shall guarantee a minimum of $97.99 per day effective 1/27/13; $99.95 effective 1/26/14; $101.95 effective 1/25/15.  In such cases the Employer will reimburse all reasonable and necessary travel expenses, including meals and including the cost of hotel, if such Orchestrator or Copyist is required to stay away overnight.

(7)     Orchestrators will not be required to attend program recording sessions unless engaged as Music Sound Consultant.

(8)     Payments for music preparation are due not later than twenty-one (21) working days following submission of W-4 forms and bills for services rendered.

(9)     **HEALTH AND WELFARE CONTRIBUTION** — The Company will contribute to any existing lawful Health and Welfare Fund of any Federation Local and commencing thirty (30) days after notice in writing to any such lawful Fund as may be established hereafter by any other Federation Local, the sum of $22.00 per day effective January 27, 2013; $24.00 per day effective January 26, 2014; and $25.00 per day effective January 25, 2015, for work performed within the jurisdiction of such Federation local by each Arranger, Orchestrator, and Copyist covered by this Agreement.

With respect to all other musicians, Health and Welfare payment for musicians rendering services under this Agreement shall be paid to each musician, regardless of the place where the musician performed the services.

Payments will be made simultaneously with Musicians wage scales.

(10)    **PICKUP AND MESSENGER SERVICES** — Pickup and messenger services shall be paid by the Employer.

(11)    Music prepared for a program under the terms of this Agreement shall not be furnished to any artists or other person.

(12)    **MUSIC REPORTS** — On variety shows it shall be the responsibility of the Leader, unless the Producer designates the Contractor or Librarian to prepare a Music Report which lists the musical selection, the artist, the Arranger or Orchestrator, the Copyist, the number of bars of music in the arrangement, and the instrumentation of the orchestra in the show; and shall indicate as to each selection whether it was prepared for the show and if not, whether it was previously used in the production of a television program, and if so, when and where, if then known.  Within five (5) days after production the preparer shall submit a copy of such report to the Producer and the Local.  This Report is for informational purposes only and shall not create any obligation on the Producer.

## EXHIBIT A:

## RE: FILM MUSICIANS SECONDARY MARKETS FUND AGREEMENT*

The following additional terms and conditions will apply to payments made to the Film Musicians Secondary Markets Fund (the "Fund") under Paragraph 13 (Supplemental Markets) of the Agreement:

(1)    **Reports**.  All payments shall be accompanied by the reports required under Paragraph 13.

(2)    **Allocation of payments**.  All payments will be allocated to a separate subfund ("Subfund") to be established by the Fund.  Each instrumental musician, leader, contractor, arranger and orchestrator whose services were included in any television program for which Supplemental Market Fees are paid ("participating musician") shall receive an equal portion of the part of the musicians' share of the Subfund which is allocable to such television program.  For purposes of the foregoing sentence, the term "musicians' share of the Subfund" shall be an amount equal to the sum of the contribution of the Producers, any investment earnings of the Subfund, and any "unclaimed amounts," as defined in paragraph 2(g) of the Film Musicians Secondary Markets Fund Agreement (the "Fund Agreement"), less (i) all expenses reasonably incurred in the establishment and administration of the Subfund; and (ii) amounts reasonably reserved by the Administrator as an operating fund, and for contingencies, and for omission claims.

(3)    **Audit Rights**.    The Fund shall have the same audit rights provided to the Federation under paragraph 13(C)(2)(e) of the Agreement with respect to all payments due to the Fund under paragraph 13 of the Agreement.

(4)    **Miscellaneous Terms and Conditions**.    All payments to and distributions from the Fund shall be subject to the terms and conditions set forth in the Film Musicians Secondary Markets Fund Agreement (a copy of which is attached hereto as Exhibit A-1), as it may be amended from time to time (the "Fund Agreement"), with the following exceptions:

1.    The term "Producer," wherever it appears throughout the Fund Agreement, shall mean "Producer" within the meaning of the Television Videotape Agreement, and any other party which has undertaken the obligation to make payments to the Fund as set forth in paragraph 2(c) of the Fund Agreement.

2.    The term "Fund," wherever it appears (and the term "Special Payments Fund" in paragraph 3(a), shall be replaced with the term "Subfund."

3.    In paragraph 1(a), the reference to "Articles 15 and 16 of the Basic Theatrical Agreement and Article 14 of the Basic Television Agreement" shall be replaced with "Article 13 of the Television Videotape Agreement and the side letter agreement(s) to the Television Videotape Agreement dated (June 1, 2002 – May 31, 2006)."

4.    In paragraph 1(c) the reference to "quarter" shall be replaced with "year."

5.    In paragraph 2(a) (second paragraph) the reference to "television motion picture" shall be replaced by "television program."

6.    Paragraph 2(b) shall be deleted and the Fund shall have no obligation to make any payments to any governmental entity on behalf of the producers.

7.    Paragraph 2(f) shall not apply.

8.    In paragraph 3(b), the reference to "the Basic Theatrical Agreement or in the Basic Television Agreement" shall be replaced with the "Television Videotape Agreement."

9.    Paragraphs 4 through 6 shall not apply; however, the producers and the Federation will separately address the appropriateness of an oversight mechanism.

*****Previously known as the Theatrical and Television Motion Picture Special Payments Fund**

## EXHIBIT A-1:

## THEATRICAL AND TELEVISION MOTION PICTURE
## FILM MUSICIANS SECONDARY MARKETS FUND AGREEMENT*

**THIS AGREEMENT** is made as of the 16th day of February, 1996, by and between the undersigned, and such other companies as shall hereafter agree to contribute to the fund referred to hereafter (individually called "Producer" and collectively called "Producers"), the undersigned administrator ("Administrator") of the Special Payments Fund ("Fund"), and the American Federation of Musicians of the United States and Canada ("Federation").

### WITNESSETH:

A.    Heretofore, each Producer has executed and delivered a "Special Payments Agreement" (the "1972 Special Payments Fund Agreement") pursuant to its undertaking so to do as provided in the AFM Basic Theatrical and Motion Picture Agreement of 1972 and the AFM Basic Television Film Agreement of 1972.

B.    It is the intention of the parties hereto to enter into an agreement which, as to such parties, continues the arrangement provided for in the 1972 Special Payments Fund Agreement and which contains the same terms and conditions as are in such 1972 Special Payments Fund Agreement.

C.    Each Producer is executing and delivering this Agreement pursuant to its undertaking so to do as provided by AFM Basic Theatrical Motion Picture Agreement of 1996 (the "Basic Theatrical Agreement") and AFM Basic Television Film Agreement of 1996 (the "Basic Television Agreement"), simultaneously herewith entered into by the Federation.

D.    Each producer by executing and delivering this Agreement assumes the duties and obligations to be performed and undertaken by each such Producer hereunder.  The Administrator has been designated collectively by the Producers, who have requested it to assume and perform the duties of the Administrator hereunder and the Administrator is willing to do so in the manner prescribed herein.

**NOW, THEREFORE,** in consideration of the promises, of the mutual covenants herein contained, of the undertakings assumed by each Producer, and of the undertakings assumed herein by the Administrator at the request of the Producers, it is agreed as follows:

1 (a)    There are incorporated herein and made a part hereof as though fully set forth herein Articles 15 and 16 of the Basic Theatrical Agreement and Article 14 of the Basic Television Agreement (the "Operative Articles").

(b)    Subject to Paragraph 2(c) hereof, each Producer shall make payments to the Administrator called for in the Operative Articles.

(c)    Each Producer, on or before sixty (60) days after the end of the calendar quarter, will pay to the Administrator such portion of the aforesaid payments as may have accrued pursuant to the terms of the Operative Articles during the preceding calendar quarter.  Each payment hereunder shall be accompanied by reports required by the Operative Articles.  A Producer who is delinquent in any payment hereunder for more than sixty (60) days after written notice from the Fund shall, within ten (10) business days, pay both the amount due and liquidated damages in the amount of ten percent (10%) of that payment.

(d)    All payments and supporting documentation and any other communications from each Producer to the Administrator shall be sent to the Administrator at its office located in New York, New York.

***Previously known as the Theatrical and Television Motion Picture Special Payments Fund**

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

2 (a)   The Administrator accepts the duties hereby assigned to it and shall establish the proper administrative machinery and processes necessary for the performance ft its duties hereunder.

The Administrator each year shall, as soon as practicable after the end of the Fund's fiscal year (March 31st) distribute the musicians' share of the Special Payments Fund (as defined in the Operative Articles).  Each participating musician shall receive such amounts as are designated as payable to him/her in the Operative Articles; and in determining said amount, the Administrator shall determine that part of the musicians' share of the Fund allocable to each television motion picture covered by the Operative Articles.

In the event of death of a musician entitled to a payment hereunder, the Administrator shall distribute such payment to the Beneficiary designated by such musician on a form provided by the Administrator for such purpose or, if no such beneficiary is so designated, the beneficiary (designated by such musician pursuant to the American Federation of Musicians and Employers' Pension Fund; and if no beneficiary be so designated, then to the surviving spouse of such musician; and if there be no such person, to the musician's estate.

(b)   The producers, individually and collectively, hereby irrevocably designate the Administrator as their agent to pay from the Producers' share of the Fund any Social Security Tax, federal and/or state Unemployment Insurance Tax, other employment taxes, disability Insurance premiums, and/or Worker's Compensation premiums, which may be owing by the Producer individually and/or collectively, as employer or employers, with respect to the distribution of the musicians' share of the Fund.

(c)   Notwithstanding any other provision of this Agreement to the contrary, the Administrator shall refund to each Producer that part of the Producer's payment to the Fund representing a part of all of said Producer's portion of the total employer taxes and insurance premiums which may be payable under the Operative Articles and this Agreement with respect to the distribution of the musician's share of the Fund, which the Producer, at the time it makes its annual payment to the Fund, may request be refunded to it, or which must be paid by the Producer, and not the Fund, to the relevant government agency or authority pursuant to any law, rule, regulation, ruling or other communication of any government agency or authority.  Any such refund, and all reports, returns, information or other material, completed in proper form for reporting or filing, which is necessary for payment, and reporting or filing with respect thereto, of any such employer taxes or insurance premiums to the relevant government agency or authority by each Producer shall be transmitted to each Producer by the Administrator so as to enable the Producer to timely, accurately and completely make such payments and reports or filings.  If a refund is made to a Producer under this Paragraph 2(c), the Administrator shall not be responsible for payment of said Producer's employer taxes or insurance premiums payable under the Operative Articles and this Agreement with regard to the distribution of the musicians' share of the Fund with respect to which the refund is made.  Should any government agency or authority require information, returns, reports or other material in regard to employer taxes or insurance premiums payable with respect to any distribution of the musicians' share of the Fund to be filed or reported by any Producer, rather than the Fund, (even though payment of such employer taxes or insurance premiums is made by the Fund), or should any Producer request that it, rather than the Fund, file or report such information, returns, reports or other material, the Administrator shall transmit to the Producer all such reports, returns, information or other material, completed in proper form for reporting or filing, so as to enable the Producer to make such filing or reporting timely, completely and accurately.

For purposes of this Paragraph 2(c), the term "Producer" shall include any party which has undertaken, pursuant to the Operative Articles, a Producer's obligation to make payments to the Fund and any other party which as acted as agent on behalf of a Producer with respect to payment to the Fund.

(d)   The Federation has agreed to furnish to the Administrator, and to cause its local unions to furnish to the Administrator, all data in the possession or subject to the control thereof which is necessary and proper to assist in the orderly and accurate distribution to musicians as provided herein, and to request the Trustees of the American Federation of Musicians and Employers Pension Fund to do likewise upon reimbursement of all costs reasonably incurred thereby in so doing.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

(e)     The Administrator shall indemnify and hold the Producers harmless out of the Fund against any liability for making any of the payments to the musicians under Paragraph 2(a) hereof or any payments of employment taxes and insurance premiums which may be required to be made by the Administrator under Paragraph 2(c) hereof, it being the express intent of the parties that all such payments are to be made out of the Fund with no further cost or expense of any kind whatsoever to the Producers.  Without limitation of the foregoing, the Administrator also shall furnish a surety bond with a responsible surety company satisfactory to the Producers and to the Federation, to guarantee the full and faithful performance of its duties as herein described.

(f)     In making distribution to musicians hereunder, the Administrator shall clearly and legibly display the following legend on all checks, vouchers, letters or documents of transmittal: "This is a special payment to you by the Motion Picture and Television Producers who are operating under the AFM Basic Theatrical Motion Picture Agreement, as amended, negotiated by the American Federation of Musicians," and/or "This is a special payment to you by the Motion Picture and Television Producers who are operating under the AFM Basic Television Motion Picture Agreement negotiated by the American Federation of Musicians."

(g)     If a musician for whom a distributive share has been set apart cannot be found or if payment under this Agreement has been tendered but is not completed after efforts which the Administrator deems reasonable, the Administrator shall add such share ("unclaimed share") to a reserve account and hold the same pending receipt of claim until the end of the third fiscal year after the date on which such share was first payable.  Thereafter, the unclaimed share shall be redeposited in the musicians' share of the Fund as defined in the Operative Articles for distribution as provided in Paragraph 2(a).  If, subsequent to the redeposit of such unclaimed share, the musician asserts a valid claim with respect to such unclaimed amount, the Administrator shall pay such claim ("Past-Year's Claim") and such payment shall be deemed an expense of the Fund.

(h)     Any payments otherwise due to musicians which shall be less than ten dollars ($10.00) shall be regarded as "de minimis" ("de minimis amounts") and shall be added to a reserve account.  Provided that, when the de minimis amount(s) so deposited to a musician's credit, when added to any current distribution due such musician, equals or exceeds the sum of ten dollars ($10.00), said de minimis amount(s) shall be added to such current distribution and paid to such musician.

3 (a)     In the event that any Producer shall default in the payment of any sums to the Administrator when the same shall become due pursuant to this Agreement, the Administrator shall have the duty, right and power forthwith to commence action or to take any other proceedings as shall be necessary for the collection thereof, including the power and authority to compromise and settle with the Federation's consent.  The Administrator's reasonable expenses, attorneys' fees and other disbursements incurred in the collection of any overdue sums shall be paid to the Administrator by the Producers as defaulting and such payment shall be added to the Special Payments Fund.

(b)     Nothing contained herein shall create any cause of action in favor of any musician as defined in the Basic Theatrical Agreement or in the Basic Television Agreement against any Producer but the Federation may enforce distribution of the musicians' share of the Fund on behalf of the individual musicians.

(c)     The Administrator shall deposit all money and property received by it, with or without interest, with any bank or trust company, insured by the Federal Deposit Insurance Corporation and having capital, surplus and undivided profits exceeding Five Million Dollars ($5,000,000); provided, however, that in the event that Canadian dollars are receivable by the Administrator and it is not feasible or desirable to convert such Canadian dollars into United States Funds, such Canadian funds and any securities purchased therewith may be deposited in the Chartered Bank of the Dominion of Canada, anything herein to the contrary notwithstanding.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

Except as modified by the provision of Paragraph 3(d) hereof, the Administrator shall have the right and power to invest and reinvest the said money and property only in short term investments (not to exceed one year in duration), in bonds and other direct obligations of the United States of American and of the Dominion of Canada, high grade commercial paper, insured bank certificates of deposit, and commingled investment funds managed by banks or trust companies for which the Administrator or some other party may be engaged as investment manager for a reasonable fee. Such investments may be made without regard to the proportion which any such investment or investments may bear to the entire amount of the Fund and to sell, exchange and otherwise deal with such investments as to the Administrator may seem desirable.

(d)　In connection with the collection of any sums due to it hereunder, the Administrator may consent to and participate in any composition of creditors, bankruptcy, reorganization or similar proceedings, and in the event that as a result thereof the Administrator shall become the holder of assets other than money, obligations to pay money conditioned only as to the time of payment, or property of the class specified in Paragraph 3(c) hereof (which assets are in this subsection (d) called "property"), the Administrator may consent to and participate in any plan of reorganization, consolidation, merger, combination, or other similar plan, and consent to any contract, lease, mortgage purchase, sale or other action by any corporation pursuant to such plan and accept any property which might be received by the Administrator under any such plan, whether or not such property is of the class in which the Administrator, by Paragraph 3(c) hereof, is authorized to invest the Fund; the Administrator may deposit any such property with any protective, reorganization or similar committee, delegate discretionary power thereto, and pay part of its expenses and compensation and any assessment levied with respect to such property; The Administrator may exercise all conversion, subscription, voting and other rights of whatsoever nature pertaining to any such property, and grand proxies, discretionary or otherwise, in respect thereof and accept any property which may be acquired by the Administrator by the exercise of any such rights, whether or not such property is of the class in which the Administrator, by Paragraph 3(c) hereof, is authorized to invest the Fund. Anything to the contrary contained in this Paragraph 3(d) notwithstanding, the Administrator shall reasonably endeavor to dispose of any such property in order that the Fund, to the fullest extent possible, at all times shall be comprised as specified in Paragraph 3(c) hereof.

(e)　Parties dealing with the Administrator shall not be required to look to the application of any monies paid to the Administrator.

(f)　Provided that the Administrator exercises due diligence and the highest standard of professional conduct in performing duties for the Fund, the Administrator will not be liable for any loss or damage resulting from anything done or omitted in good faith, nor shall the Administrator be subject to any personal liability for moneys received and expended in accordance with the provisions of this Agreement. In addition to the surety bond required by Paragraph 2(e) above, the Fund will secure any insurance coverage which may be necessary or advisable by virtue of this subparagraph (f).

(g)　The fiscal year of the fund shall be the twelve-month period from April 1 to the next March 31. Within ninety (90) days after the end of each fiscal year, the Administrator shall furnish a statement for such fiscal year of its operations to each Producer hereto making payments to the Administrator and to the Federation. Such statements shall set forth in detail the properties and moneys on hand and the operations of the Administrator during the immediately preceding fiscal year, including without limiting the details of any compromise or settlement made by the Administrator with any Producer, and such other information and data as shall be appropriate to inform fully the recipients of such statements and shall be certified by an independent certified public accountant.

(h)　The Administrator, at all times without limitation to the duration of the Agreement, shall keep full and accurate records and accounts concerning all transactions involving the receipt and expenditure of moneys hereunder and the investment and reinvestment thereof, all in convenient form and pursuant to approved and recognized accounting practices.

Each Producer and the Federation shall have the right from time to time, without limitation to the duration of this Agreement, and at all reasonable time during business hours, to have their respective duly authorized agents examine and audit the Administrator's records and accounts for the purpose of verifying any statements and payments made by the Administrator pursuant to this Agreement, during a period not exceeding two (2) years preceding such examination.  The Administrator shall afford all necessary facilities to such authorized agents to make such examination and audit and to make extracts and excerpts from said records and accounts as may be necessary or proper according to approved and recognized accounting practices.

(i)     No musician shall have any right to assign all or any portion of the payments to which such musician shall become entitled hereunder, and any attempted assignment of all or any portion of such payments shall be null and void and of no legal effect; provided, however, that the Administrator shall recognize and honor lawful assignments to the Federation of a portion of the payments to which any musician shall become entitled hereunder.

4 (a)   The Oversight Committee ("Committee") will consist of one (1) or more Producer representatives (but not exceeding three (3) such representatives) appointed by the AMPTP. A representative or representatives of the AFM (but not exceeding three (3) such representatives) appointed by the AFM President shall serve as liaison(s) to the Committee and may attend all Committee meetings on a non-voting basis and review all written materials provided by the Fund to the Committee that are not subject to a confidentiality agreement.  Materials that are subject to a confidentiality agreement shall be available for review by only one liaison designated for that purpose by the AFM President, upon request of such liaison.  Confidential materials so provided shall not be copied and shall be returned to the Fund when any issues pertaining to such materials have been resolved.

The Committee will meet at periodic intervals at least annually.  The Fund shall pay for all reasonable expenses incurred by the Committee members and the AFM liaison(s) in carrying out the Committee's activities.

The Committee members and the AFM liaison(s) will be covered by any necessary or advisable liability insurance policy, which will be paid for by the Fund.

(b)     The AMPTP will have the right to replace any Producer representative(s) on the Committee by written notice to the Administrator and to the President of the AFM, and the AFM President will have the right to replace any AFM liaison(s) to the Committee by written notice to the Administrator and to the President of the AMPTP.

5 (a)   The annual budget for the costs associated with the operation of the Fund, including the compensation of the Administrator, shall be approved by the Committee after consultation with the AFM liaison(s). Such approval may be withheld only if the Committee reasonably determines that the budgeted amounts with which the Committee disagrees do not in a cost-effective manner further the purposes for which the Fund is maintained.

(b)     The manner in which the collection and audit program are functioning will be reviewed by the Committee.  Contribution and audit reports may be reviewed by the Oversight Committee and AFM liaison(s) upon their request solely for the purpose of evaluating the collection and audit program, subject to the following: (i) the members of the Committee shall be bound by any confidentiality agreements applicable to such contribution and audit reports; (ii) to the extent that such contribution and audit reports are subject to a confidentiality agreement, the Fund shall make them available to review only to the AFM liaison so designated for that purpose in accordance with the provisions of Paragraph 4(a) above; and (iii) if a Producer representative of the Oversight Committee is an employee of a contributing employer, such representative may review any collection or audit reports, including those relating to contributing employers other than such representative's own employer, but only to the extent such reports do not contain confidential information with respect to such other contributing employers.

Any issues as to whether information should be disclosed to such Producer representative pursuant to this subparagraph 5(b)(iii) shall be submitted to an AMPTP representative for review and advice.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

6 (a)   The Administrator shall be subject to removal by the Committee after consultation with the AFM liaison(s).  The Administrator may resign at any time by thirty (30) days written notice to the Producers and the Federation.

(b)   In the event of a vacancy for any reason in the position of the Administrator, a successor Administrator shall be appointed by the Committee after consultation with the AFM liaison(s).

(c)   No Administrator or member of the Committee under this Agreement shall be a representative of labor, or of any union, or of employees within the meaning of Section 302(b) of the Labor Management Relations Act, 1947.

7   Any person, firm, corporation, association or other entity may apply to become an additional Producer to this Agreement by executing and delivering to the Administrator three (3) counterparts of Schedule 1 hereto attached.  The Administrator shall indicate acceptance of such application by appropriately completing such application, executing three (3) counterparts, and delivering one (1) such counterpart to such additional Producer at the Administrator's office in the City of New York and one (1) such counterpart to the Federation.  The Administrator shall forthwith advise the Federation of the execution and delivery of such agreement, and regularly advise all other Producers thereof.

8   This Agreement shall be governed, construed and regulated in all respects by the laws of the State of New York.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year first above written.

By _____   Date   8/3/15
CBS Broadcasting Inc.

By _____   Date   6/19/15
ABC, Inc.

By _____   Date   7/10/15
NBC, Inc.

American Federation of Musicians

By _____   Date   6/19/15
Ray Hair, President

## SIDE LETTERS

The following side letters have been agreed to by all of the negotiating parties: American Broadcasting Companies, Inc. (an indirect wholly owned subsidiary of ABC, Inc.), CBS Broadcasting, Inc., National Broadcasting Company, Inc. and the American Federation of Musicians of the United States and Canada. [Contact the AFM Electronic Media Services Division to obtain copies of the original letters.]

### SIDE LETTER 1—As of June 1, 2002

**Re:  Miscellaneous Modifications of Agreement**

The following sets forth our understanding and agreement with respect to certain modifications in the Agreement of even date.  This letter shall be applicable to the network companies and shall be available for signature to any producer of a network program who signs the Agreement of even date, or in the case of an advertising agency, a letter of adherence thereto.

1.  Article 4 of the Agreement shall be revised by deleting the first sentence and by revising the second sentence to read as follows:

    "All network programs produced in the United States or Canada by the Company, or for the Company when the Company has the underlying property rights, if scored, shall be scored in the United States or Canada."

    and by adding thereto another sentence to read as follows:

    "The word 'scored' as used herein, refers to music such as theme music, background music, bridges, cues, etc., if such music is recorded especially for a program or program series, and as to such scored music, the provisions of Paragraphs Q and R of Exhibit I shall govern."

2.  Article 5(B) (Sound Track Regulations) shall be revised by deleting the first sentence thereof.

3.  In Exhibit I, Paragraph J(1) and (3), the appearance of the words "and conditions" is in no way intended to change our former practices in this area.

4.  As an interpretation of Exhibit I, Paragraph K, it is agreed that musicians may be required to wear tuxedos or business suits for no additional fee.

5.  Programs played on stations XEW-TV, XEQ-TV, XH-TV or XHGC-TV in Mexico City, ZBM, Pembroke, Bermuda, for CBS and NBC, and ZFB-TV, Hamilton, Bermuda, for ABC, when such plays are made pursuant to an affiliation arrangement with one of the networks shall be deemed to be domestic plays for purposes of Articles 8 and 9 of the Agreement.

### SIDE LETTER 2—As of June 1, 2002

**Re:  Implementation of Article 12**

This will confirm our understanding and agreement with respect to the Agreement of even date.

We recognize that the network companies have traditionally made their facilities available to program producers, and we recognize that in the United States we may not lawfully interfere, in any manner, with that practice. Accordingly, we have not, and hereby agree that we shall not invoke Article 12 with respect to that practice.

At the same time, the network companies agree that they will not hire musicians to perform on programs produced in their facilities by producers who cannot themselves hire musicians because such producers have been struck by the Union or are on the Union's unfair list.

**SIDE LETTER 3—As of June 1, 2002**

**Re:  Exhibit I**

The following sets forth our understanding and agreement with respect to Exhibit I of the Agreement of even date:

(1)    With respect to Paragraph Q(1), it is understood that the instrumentalist referred to therein may be retained as music supervisor and his compensation for such service may be applied against the difference between the prior year's cost for musical services and the $32,500 amount referred to in such paragraph.

(2)    With respect to Paragraph S(1), it is understood that by past practice the terms "openings" and "closings" used therein include lead-ins and lead-outs.


**SIDE LETTER 4—As of June 1, 2002**

**Re:  Application of Articles 8 and 9 to Daytime Serials Scoring**

This letter will confirm our understanding and agreement with respect to the application of Articles 8 and 9 of the Videotape Agreement to music scored for daytime serials.

In applying Articles 8 and 9, the product shall be considered on an annual basis, with the "scale payment", in the case of Article 8, and the "scale pay" in the case of Article 9, being computed at the total cost for musicians (at minimum) for that year's scoring (with a minimum of $32,500 per annum).  The applicable percentages set forth in those Articles will be applied to such "scale payment", and "scale pay" respectively, and will be distributed pro-rata among the musicians who participated in such scoring.  Any questions as to the portion of such distribution attributable to any musician will be determined by the Office of the President of the AF of M.

In the event that the play of any serial in foreign markets, or the domestic replay of any serial, involves less than a year's product, the payments to the musicians involved shall be proportionate to the portion of a year so played.  To illustrate:

(a)    in the event that the "scale pay" for a given serial for a given annual (52 week) period is $40,000 and 39 weeks of the serial are played in Area 4 only, then the payments to the musicians for such plays would be computed as follows under Article 9(A):

$$5\% \text{ X } \$40,000 \text{ X } \frac{39}{52} = \$1,500 \quad \text{(to be divided pro-rata among the musicians who participated in the scoring)}$$

(b)    in the event that the "scale payment" for a given serial for a given annual (52 week) period is $30,000 and 20 weeks of that serial go into a first domestic replay, the payments to the musicians for such replay would be computed as follows under Article 8:

$$75\% \text{ X } \$30,000 \text{ X } \frac{20}{52} = \$8,654 \quad \text{(to be divided pro-rata among the musicians who participated in the scoring)}$$


**SIDE LETTER 5—As of June 1, 2002**

**Re:  Application of Article 13 to Music Scored for Daytime Serials**

This letter will confirm our understanding and agreement with respect to the application of Article 13 (Supplemental Markets) of the Videotape Agreement to music scored for daytime serials.

In applying Article 13, the product shall be considered on an annual basis, with a base amount for all musicians combined equal to the total cost for musicians (at minimum of $32,500 per annum).  A flat 20% will then be applied to such base amount and the resultant sum will then be apportioned pro-rata among the musicians who participated in such scoring.  Any questions as to the portion of such distribution attributable to any musician will be determined by the Office of the President of the AFM.

In the event that the play of any serial in supplemental markets, involves less than a year's product, the payments to the musicians involved shall be proportionate to the portion of a year so played.  To illustrate:

> In the event that the base amount for a given annual (52 week) period is $40,000 and 39 weeks of the serial are played, then the payments to the musicians for such plays would be computed as follows:

$$20\% \ X \ \$40,000 \ X \ \frac{39}{52} \ = \ \$6,000 \quad \text{(to be divided pro-rata among the musicians who participated in the scoring)}$$

## SIDE LETTER 6—As of June 1, 2002

### Re:  Application of Article 13 to Theme Music Production

This letter will confirm our understanding and agreement with respect to the application of Article 13 (Supplemental Markets) to theme music produced under the AFM Television Videotape Agreement:

A.   In applying Article 13 for theme music utilized on a twenty-six (26) week basis, each unit of 26 weeks of programming for which a cycle theme fee was originally paid shall count as one program for which supplemental market payments must be made according to the computation formula in Article 13.

B.   In applying Article 13 for theme music utilized on a thirteen (13) week basis, each unit of 13 weeks of programming for which a cycle theme fee was originally paid shall count as one program for which supplemental market payments must be made according to the computation formula in Article 13.

## SIDE LETTER 7—As of June 1, 2002

### ["Distributor's Gross" Computations – Deleted as of January 27, 2013]

## SIDE LETTER 7A—As of June 1, 2002

### Re:  Computations under Most Favored Nations Agreement

This will confirm our favored nations agreement regarding the basis upon which "Distributor's Gross" is computed with respect to videodisc/cassettes under the Supplemental Market provisions of our agreement as set forth in our confirmation letter dated June 1, 1986.

If a definition more favorable to another union is negotiated during the term of our new agreements with the AFM, such definition will thereafter replace the definition set forth in our June 1, 1986 confirmation letter.

## SIDE LETTER 8—As of June 1, 2002

### Re:  Terms & Conditions for Basic Cable Employment

This will confirm our understanding that the Producer agrees that prior to the employment of any musician in an entertainment program intended primarily for "network" exhibition on Basic Cable, producer will give at least sixty (60) days' advance notice to the Federation of such proposed employment.  Producer and the Federation agree to meet within thirty (30) days from receipt of such notice for the purpose of negotiating with respect to the terms and conditions for such employment.  If no agreement is reached with respect thereto within such sixty (60) day period, the Federation may instruct its members to withhold services with respect to the production of such program.

**SIDE LETTER 9—As of June 1, 2002**

**Re:  Electronic Multi-Tracking Provision**

The purpose of this letter is to confirm the oral understandings reached between the American Federation of Musicians and representatives of Industry as follows:

During the course of the negotiations which culminated on July 16, 1996, in an agreed upon successor collective bargaining agreement, Industry proposed to insert into the Electronic Multi-Tracking provision language that would exclude "package deals" from the multi-tracking rates specified in that provision;

Thereafter, as part of reaching an overall successor collective bargaining agreement the Industry withdrew its proposal; and

The Federation agrees that it will not rely on this foregoing bargaining history to prohibit the future negotiation of "package deals" provided that the rates paid and conditions established under any such package deal are not in any way inferior to those established by the Electronic Multi-Tracking provision.

If the foregoing conforms with your understanding, please sign below.


**SIDE LETTER 10 – As of June 1, 2003**

**Re: Promos Produced by a Network Signatory**

This letter will confirm the agreement reached during the course of the recently completed round of collective bargaining, as follows:

During the 2002-2003 negotiations the parties discussed promotional announcements ("promos") produced by the Networks to promote their networks or the programs they broadcast.

The Federation agrees that with respect to any promo produced by a network signatory to the Television Videotape Agreement which promo includes music from any sound recording produced under the Sound Recording Labor Agreement (or its predecessor Phonograph Record Labor Agreement), such work is not covered by Article I (A) (SCOPE OF AGREEMENT) and, accordingly, the network signatory will not be held liable by the Federation and/or its Local Unions under this Agreement to make any payments for services rendered by Musicians in producing those sound recordings.

The Federation further agrees, consistent with past industry practice, that music from any sound recording produced under the Sound Recording Labor Agreement (or its predecessor Phonograph Record Labor Agreement) used in network promos produced for Television Videotape programs does not constitute a new use under Paragraph 21 of the Sound Recording Labor Agreement.

The parties also discussed the industry practice with regard to obligations to the musicians who performed on sound recordings used in these promos for other programs and films but not used in the underlying program and film.  The Federation has no present plans to change this practice.

If the Federation seeks to change this practice for other programs and films, it will notify the Networks in writing of its plan to make this change.  The Federation may not initiate such change until the parties have 90 days to meet and negotiate.  If no agreement is reached during this period, the Networks may reopen the entire Television Videotape Agreement.

Alternatively, if in the opinion of the Networks, the practice described above changes, the Networks may initiate the 90-day period to meet and negotiate.  If no agreement is reached during this period, the Networks may reopen the entire Television Videotape Agreement.

The parties may extend the 90-day period by mutual agreement.

**SIDE LETTER 11 – As of January 27, 2013**

**Re:  Exhibition of Television Programs Transmitted Via New Media**

This Side Letter confirms the understanding of the American Federation of Musicians of the United States and Canada (the "Federation") and the Producers (collectively "the parties") under the AFM Videotape Agreement (hereinafter "the Television Agreement") concerning the application of the Television Agreement to the exhibition on the Internet, mobile devices (such as cell phones or PDAs) and any other new media platform known as of the date of ratification (hereinafter collectively referred to as "New Media") of television programs (excluding news, documentary, sports and promos).  The payments called for by this Side Letter shall apply only with respect to "Distributor's gross" received on or after the first day of the first calendar quarter following ratification of the Television Agreement.

        1.  If the Consumer Pays

              a.  License for Limited Period or Fixed Number of Exhibitions

When the subscriber pays for the program either on a subscription or per program basis, and when the payment is in exchange for the right to view the program for a fixed and limited period of time or a fixed number of exhibitions, the Producer shall pay one percent (1%) of "Distributor's gross," as defined in Paragraph 9 below.  Said amount shall be paid to the Film Musicians Secondary Markets Fund (hereinafter "FMSMF").

              b.  Paid Permanent Downloads ("Download-to-Own" or "Electronic Sell Through") ("EST")

The following shall apply only to programs produced after the date of ratification:

If the consumer pays for an EST copy of a program, the Company shall pay 1% of 20% of "Distributor's gross," as that term is defined in Paragraph 9 below, for the first 100,000 units, and 1.9% of 20% thereafter.  Said amount shall be paid to the FMSMF.

        2.  Streaming

There shall be no payment for advertising supported streaming of programs.

        3.  Agreements and Data

On a semi-annual basis commencing in the first calendar quarter after notice of ratification, within ten (10) business days after such request,  the Producer shall provide for inspection by the Federation's designated employee or auditor, at Producer's premises in Los Angeles, full access (full access includes access to all agreements, notwithstanding any confidentiality clause contained therein, and access to all side letters, exhibits, addenda, and other ancillary documents) to all unredacted license, distribution, and other agreements pertaining to new media exploitation of covered programs that were entered into during the immediately preceding inspection period.  (In the initial quarter, the Producer shall also provide the Federation with access to all said agreements that were entered into between January 1, 2012, and December 31, 2012).  In any subsequent semi-annual inspection, the Federation's designated employee or auditor may re-inspect any agreements previously inspected and inspect any agreements not previously inspected.

Upon request, in a manner to be mutually agreed upon in good faith, the Producer shall expeditiously provide, or make available, to the Federation data in its possession or control, or the possession or control of its related distribution entities, regarding the new media exploitation of covered programs, such as number of downloads or streams by source and ad rates, where relevant to the payments required under this Side Letter.

4.  Recordkeeping and Reporting

Payment for exploitation of covered programs in new media shall be due sixty (60) days after the end of the quarter in which the "Distributor's gross" from such exploitation is received.  The Producer shall accompany such payments with reports regarding the "Distributor's gross" derived from such exploitation, which shall be specified by medium and source whenever reasonably possible and will be separated from revenues derived from exploitation of such programs in traditional media.  When the Producer allocates revenues between new media rights and other rights in any such programs, among new media rights in multiple such programs, or otherwise, it shall specify such allocation.

5.  Confidentiality

The information provided to the Federation by the Producer will be treated as confidential and appropriate arrangements will be made to safeguard the confidentiality of that information.

6.  Reservation of Rights

With respect to television programs, the Producer has agreed to a separate payment for this use in new media because exhibition in new media is at this time outside the primary market.  The Producer reserves the right in future negotiations to contend that the pattern of release has changed so that this use constitutes or is a part of the primary market of distribution of television programs and that, therefore, no additional payment should be made with respect to the exhibition of television programs (including those covered by this Agreement) in new media. The Federation reserves the right in future negotiations to contend to the contrary, and further to assert that regardless of whether other exhibitions are or have become part of the primary market, residual provisions for television programs so exhibited should be improved.

7.  Sunset Clause

The parties recognize that this Side Letter is being negotiated at a time when the business models and patterns of usage of television programs in New Media are in the process of exploration, experimentation and innovation. Therefore, all provisions of this Side Letter expire on the termination date of the Television Agreement, and will be of no force or effect thereafter.  No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for use of television programs in New Media to be in effect thereafter. The parties further acknowledge that conditions in this area are changing rapidly and that the negotiation for the successor agreement will be based on the conditions that exist and reasonably can be forecast at that time.  For example, the parties acknowledge that with respect to the formula in Paragraph 1.b. for electronic sell-through of television programs, the growth of electronic sell-through could adversely impact traditional home video sales. In future negotiations, the parties agree that the criteria to be considered in good faith in determining whether the electronic sell-through residual should be increased or decreased include patterns of cannibalization of the home video market and changes in the wholesale price.

8.  Use of Excerpts in New Media

Producer may use an excerpt or excerpts from a television program (other than a television program ninety (90) minutes or more in length) in new media for the purpose of promoting the television program, provided that such excerpt(s) does not exceed five (5) minutes in length.  Producer may use an excerpt or excerpts from a television program ninety(90) minutes or more in length or from a program made for the home video market in new media for the purpose of promoting the program, provided that such excerpt(s) does not exceed ten (10) minutes in length.

    a.   The following uses of a portion of music sound track from a program in new media shall be considered "promotional" and shall require no payment, whether or not the Producer receives revenue in connection therewith:

(i)  For the purpose of advertising or publicizing the specific program or serial or series from which the sound track is taken (including the video of musicians engaged in the recording of such sound track).

(ii)  In "the making of..." or "behind-the-scenes" – type programs.

(iii)  For "viral" promotion in new media of a television program or series or serial and the excerpt(s) music sound track is circulated non-commercially to multiple websites or made available for individuals to circulate.  The fact that the music sound track used in the "viral" promotion is exhibited on a revenue-generating site owned by or affiliated with the Producer shall not render this exception inapplicable, provided that the music sound track is released without payment to other sites.

(iv)  The excerpt(s) music sound track is made available for consumer generated "viral" promotion to new media sites where end users have the ability to share such music sound track with other end users (*e.g.*, Facebook, YouTube, MySpace or Crackle).

(v)  As a "ringtone" for which the consumer does not pay.  For ringtones for which the consumer pays, Producer shall pay one percent (1%) of "Distributor's gross" as defined in Paragraph 9 below.

b.  The use in new media of a portion of music sound tracks from a program for news or review purposes shall require no payment.

c.  For any use of music sound track, not within the exceptions and with or without the accompanying footage, from a television program in new media on an advertiser-supported platform or consumer pay platform, the Producer shall pay one percent (1%) of "Distributor's gross," derived from the sale or license of such music sound track.  In the case of complete production numbers, Article 5(C) of the Agreement shall also apply.

d.  The Producer shall pay sums due under this Paragraph 8 to the FMSMF, which will determine the musician(s) entitled to such sums and will prorate and distribute such sums among the musicians.

e.  "Distributor's gross" shall be as defined in Paragraph 9 of this Side Letter 11.

f.  It is understood no payment shall be required for any excerpt uses in New Media that would not require payment in traditional media.

g.  Sunset Clause

The foregoing provisions regarding use of music sound track in new media shall expire on the termination date of the Television Agreement and will be of no force or effect thereafter.  No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions for use.

9.  "Distributor's Gross" Definition

The term "Distributor's gross," for purposes of all uses in new media of television programs made for traditional media, shall be as defined in Article 13(C)(2)(b)(ii) and (iii) of the Television Agreement, as applicable.

When the "Distributor's gross" derived from new media exploitation is received from a related or affiliated entity that acts as the exhibitor/retailer of such programs, then the "Distributor's gross" received by the Producer from the licensing of such rights shall be measured by the exhibitor/retailer's payments to unrelated and unaffiliated entities in arms' length transactions for comparable programs, or, if not, then the amounts received by the

Producer from unrelated and unaffiliated exhibitors/retailers in arms' length transactions from comparable programs, or if none, a comparable exhibitor/retailer's payments to comparable unrelated and unaffiliated entities in arms' length transactions for comparable programs.

**SIDE LETTER 12 – As of January 27, 2013**

**Re:  Productions Made for New Media**

This Side Letter confirms the understanding of the American Federation of Musicians of the United States and Canada ("the Federation") and the signatory Producers (collectively "the parties"), concerning the terms and conditions applicable to the production of entertainment programs (excluding news, documentaries, sports and promos) of the type that have traditionally been covered under the AFM Television Videotape Agreement (hereinafter "the Television Agreement") that are made for the Internet, mobile devices, or any other new media platform in existence as of the date of ratification (hereinafter collectively referred to as "New Media").  With respect to such productions intended for initial use in new media, the parties agree as follows:

The parties mutually recognize that the economics of New Media production are presently uncertain and that greater flexibility in terms and conditions of employment is therefore mutually beneficial.  If one or more business models develop such that New Media production becomes an economically viable medium, then the parties mutually recognize that future agreements should reflect such fact.

**A.      Recognition**

The Producer recognizes the Federation as the exclusive bargaining representative of Employees employed within the classifications covered by the Television Agreement on entertainment programs (excluding news, documentaries, sports and promos) of the type that have traditionally been covered under the Television Agreement which are intended for initial exhibition in New Media, but excluding "Experimental New Media Productions," as that term is defined below, and produced within the geographic scope covered by the aforementioned Agreement.

**B.      Coverage**

Coverage shall be at the Producer's option with respect to "Experimental New Media Productions." Should the Producer elect to cover an Experimental New Media Production, the terms and conditions applicable to employment on Original New Media Productions, as set forth in Paragraph C and D below, shall apply.

An "Experimental New Media Production" is defined as any Original New Media Production:  (1) for which the actual cost of production does not exceed:  (a) $15,000 per minute of program material as exhibited, and (b) $300,000 per single production as exhibited, and (c) $500,000 per series of programs produced for a single order; and (2) on which fewer than two (2) recording musicians (but excluding those recording musicians who perform MIDI transcription services exclusively) are working within the geographic scope of the Television Agreement, each of whom has worked under the Basic Theatrical Motion Picture Agreement, the Basic Television Film Agreement, the TV Videotape Agreement, the Sound Recording Labor Agreement, or the Radio Canadian Broadcasting System Agreements within the last three (3) years.[1]

The actual cost of the Experimental New Media Production shall consist of all direct costs actually incurred in connection with the Production.  The only costs excluded in determining the actual cost of production shall be development costs, overhead charges, financing costs (*i.e.*, loan origination fees, gap fees, legal fees and interest), contingency of up to ten percent (10%), essential elements insurance costs, the cost of the completion bond, marketing expenses, contingent payments to talent or other parties

---

[1] The Producer shall be entitled to rely on the representation of the employee as to whether he or she meets this work experience requirement.

which are based on the proceeds derived from the exploitation of the Production and received after recoupment of the negative cost, and delivery items required by sales agents, distributors or sub-distributors (i.e., delivery materials beyond the answer print, Video Master if the Production is delivered on videotape, or the digital equivalent if the Production is delivered in a digital format).

If the Producer began production of an "Experimental New Media Production" that the Producer elected not to cover under the terms of this Side Letter, but subsequently employs two (2) or more recording musicians on the production as provided in the second paragraph of this Paragraph B, then said production shall automatically be deemed covered hereunder, starting from the first day on which at least two (2) or more such recording musicians are so employed on the production and continuing until the production is finished.

**C.      Terms and Conditions of Employment on Derivative New Media Productions**

A "Derivative New Media Production" is a production for New Media based on an existing free television program covered by the Television Agreement ("the source production").

Employees may be employed by a Producer and assigned to a Derivative New Media Production as part of their regular workday (i.e., the guaranteed call) on the source production.  The work for the Derivative production shall be considered part of the workday for the Employee on the source production and shall trigger overtime if work on the Derivative Production extends the workday on the source production past the point at which overtime would normally be triggered on the source production.  All other terms and conditions, including benefits, shall continue as if the employee were continuing to work on the source production.

In all other situations, terms and conditions of employment are freely negotiable between the Employee and the Producer, except for those provisions identified in Paragraph E below.

**D.      Terms and Conditions of Employment on Original New Media Productions**

Employees may be employed by a Producer and assigned to an Original New Media Production as part of their regular workday (i.e., the guaranteed call) on the source broadcast production.  The work for the Original New Media Production shall be considered part of the workday for the Employees on the source broadcast production and shall trigger overtime if work on the Original New Media Production extends the workday on the source broadcast production past the point at which overtime would normally be triggered on the source production.  All other terms and conditions, including benefits, shall continue as if the employee were continuing to work on the source broadcast production.

In all other situations, terms and conditions of employment are freely negotiable between the Employee and the Producer, except for those provisions identified in Paragraph E. below.

**E.      Other Provisions**

(1)      <u>Use of Previously Recorded Music</u>

(a)      The producer may use up to two (2) minutes, in the aggregate, of music, with or without the accompanying footage, recorded under an AFM Agreement(s) in a New Media Production, as such production is initially exhibited, without additional payment, provided that, within thirty (30) days of initial exhibition of the New Media Production, the Producer notifies the Federation in writing of such use, along with identification of the source agreement(s), if known.

(b)      Terms and conditions for the use in a New Media Production, as such production is initially exhibited of music, with or without the accompanying footage, previously recorded under an AFM Agreement(s) (other than under this Side Letter) that

exceeds two (2) minutes in the aggregate, shall be determined by agreement between the Producer and the Federation.

(c)     Notwithstanding the foregoing, no payment shall be due for the use of music sound track from the source production in a Derivative New Media Production.

(2)     <u>Transfer of Rights in New Media Production</u>

If the Producer should sell, assign, transfer, license or otherwise dispose of the distribution rights to a New Media Production for any market that may require residual payments for use of such Production therein under the terms of this Side Letter, Producer shall obtain from the buyer, licensee or distributor a separate agreement, made expressly for the benefit of the AFM Employer Pension Fund, requiring such buyer, licensee or distributor to comply with the provisions of this Side Letter.  Such agreement shall be in the following form:

"The undersigned, _____,
(insert name of buyer, licensee or distributor)

herein for convenience referred to as the 'Buyer,' hereby agrees with

_____ that all New Media Productions covered by
(insert name of Producer)

the AFM Television Videotape Agreement Side Letter 12 ('Productions Made for New Media') are subject to the provisions therein, relating to the payment of residuals for the use of such Productions in New Media and traditional media under Paragraph F of the Side Letter, to the AFM Employers Pension Fund; and the Buyer hereby agrees, expressly for the benefit of the AFM Employers Pension Fund, to make the payments required thereby.  It is expressly understood and agreed that the rights of Buyer to exhibit or license the exhibition of such New Media Productions in any market that may require residual payments for use of such Productions therein shall be subject to and conditioned upon payment of such residuals to the Film Musicians Secondary Markets Fund (hereinafter 'FMSMF') as provided under Paragraph F of the Side Letter, and it is agreed that the FMSMF shall be entitled to seek injunctive relief and damages against Buyer in the event such payments are not made.

Buyer shall be liable to make the payments described above but only based upon rights actually acquired by Buyer and only for the period it holds such rights.

The undersigned agrees to keep or have access to complete records showing the income derived from the distribution of New Media Productions in any market that may require residual payments for use of such Productions therein, within the entire territory for which Buyer is granted such rights, and the Federation and/or FMSMF shall have the right at all reasonable times to inspect such records.

Buyer further agrees that in the event of a sale, transfer, license or assignment of the distribution rights to the above New Media Production, Buyer shall obtain from the purchaser, transferee, licensee or assignee an Assumption Agreement covering the rights disposed of in the form set forth herein, and shall provide an executed copy of such Assumption Agreement to the Federation.  Upon delivery of such Assumption Agreement, Buyer shall not be further liable to the Federation or the FMSMF for the keeping of any records related to or the payments required based upon the rights covered under the Assumption Agreement for the exploitation of the New Media Production in any market that may require residual payments for use of such Production therein, and both the Federation and the FMSMF agree to look exclusively to the purchaser, transferee, licensee or assignee executing such Assumption Agreement for the keeping of such books or records and for making the payments attributable

to the rights acquired.  In the event Buyer fails to deliver such Assumption Agreement, it shall continue to be liable for the keeping of records and for the residual payments in connection with the exploitation of the New Media Production in markets that may require residual payments for use of such Production therein.

It is understood that additional provisions may be included in form Assumption Agreements, so long as such additional provision(s) do not vary or alter the terms of the foregoing Assumption Agreement."

Producer agrees to give notice to the Federation within thirty (30) days of each sale, transfer or license of the distribution rights to such a New Media Production in any market that may require residual payments for use of such Production therein, with the name and address of the Buyer, assignee or distributor, and to deliver to the Federation an executed copy of each Assumption Agreement entered into by the Producer.  An inadvertent failure on the part of the Producer to comply with any of the provisions of this subparagraph (5) shall in no event constitute a default by the Producer hereunder or a breach of this Agreement, provided that such failure is cured promptly after notice thereof from the Federation.

Upon delivery of such Assumption Agreement, Producer, or any subsequent owner obtaining the execution of such Assumption Agreement, shall not be further liable to the Federation for the keeping of any such records or the payments required hereunder insofar as they relate to the exploitation of the New Media Production in any market that may require residual payments for use of such Production therein, and the FMSMF agrees to look exclusively to the party last executing such an Assumption Agreement for the keeping of such records, payments and compliance with credit obligations.

(3)   Use of Payroll Company

A Payroll Company that is a party signatory to the Videotape Agreement may lend the use of its signatory status, for the purpose of producing New Media Productions under  Side  Letter12 ("Productions Made for New Media") on a production-by-production basis to any Producer not a party signatory, provided that no session shall be allowed unless an executed Assumption Agreement in the following form has been provided to the Local Union  in advance of the session.  The leader/contractor shall be responsible for achieving compliance with this requirement.[2]

"The undersigned, _____, herein for convenience
(insert name of Payroll Company)

referred to as the 'Payroll Company,' hereby agrees with

_____, that New Media
(insert name of non-signatory producer)

Productions covered by the AFM Videotape Agreement Side Letter 12 ('Productions Made for New Media') are subject to the provisions therein, relating to the payment of residuals for the use of such Productions in New Media and traditional media under Paragraph F of the  Side Letter, to the Film Musicians Secondary Markets Fund (herein referred to as the 'FMSMF'); and the Producer hereby agrees to abide by all provisions of the Side Letter. Producer also hereby agrees, expressly for the benefit of the FMSMF, to make the payments

---

[2]  The parties shall utilize best efforts to ensure that the leader/contractor complies with this requirement.  Failure of the leader/contractor to do so or problems arising in connection therewith shall be referred to the Cooperative Committee for resolution.

required by the Side Letter.  It is expressly understood and agreed that the rights of any such Producer to exhibit or license the exploitation of such New Media Productions in any market that may require residual payments for use of such Production therein shall be subject to and conditioned upon payment of such residuals to the FMSMF as provided under Paragraph F of the Side Letter, and it is further agreed that the FMSMF shall be entitled to seek injunctive relief and damages against Producer in the event any such payments are not made.

The undersigned Producer agrees to keep or have access to complete books and records showing the income derived from the sale, lease, license or distribution of such New Media Productions in any market that may require residual payments for use of such Productions therein, within the entire territory for which Producer is granted such rights, and the Federation and the FMSMF shall have the right at all reasonable times to examine and inspect such books and records."

Upon delivery of such Assumption Agreement, the Payroll Company shall not be further liable to the Federation for the keeping of any such records or the payment(s) required based on the exhibition of the New Media Production in markets that may require residual payments for use of such Production therein and the FMSMF agrees to look exclusively to the Producer who is the party to the Assumption Agreement for the keeping of such books and records, payments and compliance with credit obligations.

(4)     Union Security

The provisions of Article 3, "Union Security," of the Television Agreement shall apply to New Media Productions except (B) which shall be amended as follows:

(B)  The following provision contained in this Subparagraph (B) shall apply to services rendered hereunder in the United States and shall be included in, and whether or not so included, shall be deemed a part of all contracts calling for such services between the Employer and persons employed in a classification covered by this Side Letter:  "Persons who are employees of the Employer on the date of signing of this Side Letter, shall on or before the thirtieth (30th) day following this commencement of their employment or ten (10) days of employment under the terms of this Side Letter, whichever is later, become and continue to be members in good standing of the Federation as a condition of their employment.  The provisions of this Paragraph shall not become effective unless permitted by applicable law."

(5)     Pension and Health

On New Media Productions budgeted at $25,000 or less per minute (using the same cost elements as described in the third paragraph of Paragraph B above), Producer's only obligation hereunder shall be to make Health and Welfare contributions on behalf of each employee employed under the terms of this Side Letter pursuant to Exhibit I, Section E of the Television Agreement.

On New Media Productions budgeted at more than $25,000 per minute (using the same cost elements as described in the third paragraph of Paragraph B above), or when Employees are assigned by the Producer to a New Media Production as part of their regular workday on the source production, Producer shall be obligated to make pension and health contributions in accordance with the provisions of Article 7 and Exhibit 1, Section E, respectively, of the Television Agreement, on behalf of each employee employed under the terms of this Side Letter.

To the extent pension contributions are required under the terms of this Side Letter, the wages negotiated by the employee shall be deemed to be scale wages for the purpose of contributions to the Pension Plan.

(6)     <u>No Original Employment Required</u>

It is expressly understood and agreed that there shall be no original employment required on Productions made for New Media, including any live scoring requirement.

## F.     **Use of New Media Programs**

Only those covered New Media Productions shall generate residual payments and then only in accordance with the following:

(1)     <u>Reuse in New Media</u>

(a)     The Producer shall have the right to use an Original New Media Production budgeted at $25,000 or less per minute (using the same cost elements as described in the third paragraph of Paragraph B above) on any new media platform without limitation as to time, and without payment of residuals.

(b)     The Producer shall have the right to use an Original New Media Production budgeted at more than $25,000 per minute (using the same cost elements as described in the third paragraph of Paragraph B above) or a Derivative New Media Production without the payment of residuals under the following circumstances:

(i)     When such New Media Production is used on any free-to-the-consumer, advertiser-supported platform; and

(ii)    When such New Media Production is first released on a consumer pay platform (*i.e.*, download-to-rent, download-to-own or paid streaming), even if it is subsequently released on a free-to-the-consumer advertiser-supported platform.

(c)     If an original New Media Production budgeted at more than $25,000 per minute (using the same cost elements as described in the third paragraph of Paragraph B above) or a Derivative New Media Production is initially released on a free-to-the-consumer, advertiser-supported platform and is subsequently released on consumer-pay platforms (*i.e.*, download-to-rent, download-to-own, or paid streaming), then Producer shall have a twenty-six (26) consecutive week period of use on consumer-pay platforms, commencing with the first day of use on consumer-pay platforms, without the payment of residuals.  If the Producer uses the New Media Production on consumer-pay platforms beyond such twenty-six (26) consecutive week period, then Producer shall pay 1% of "Producer's gross," as that term is defined in Paragraph 9 of Side Letter 11 ("Exhibition of Television Programs Transmitted Via New Media") attributable to use on consumer-pay platforms beyond the twenty-six (26) consecutive week period.  Said amount shall be paid to the Film Musicians Secondary Markets Fund on behalf of musicians employed on the New Media Production.

(d)     If an original New Media Production budgeted at more than $25,000 per minute (using the same cost elements as described in the third paragraph of Paragraph A above) or a Derivative New Media Production is initially released simultaneously on free-to-the-consumer, advertiser-supported platforms and to consumer-pay platforms (*i.e.*, download-to-rent, download-to-own or paid streaming), then Producer shall have

a twenty-six (26) consecutive week period of use on consumer-pay platforms, commencing with the first day of use on consumer-pay platforms, without the payment of residuals.  If the Producer uses the New Media Production on consumer-pay platforms beyond such twenty-six (26) consecutive week period, then Producer shall pay 1% of the "Producer's gross," as that term is defined in Paragraph 9 of Side Letter 11 ("Exhibition of Television Programs Transmitted Via New Media") realized from any subsequent license that includes use on consumer-pay platforms, which "gross" is attributable to use on consumer-pay platforms beyond the twenty-six (26) consecutive week period, measured from the first day of use on consumer-pay platforms under the first license.  Said amount shall be paid to the Film Musicians Secondary Markets Fund on behalf of musicians employed on the New Media Production.

(2)     Use In Traditional Media

The provisions of Article 13 of the Television Videotape Agreement regarding exhibition on "pay television," as that term is defined in Article 13, shall apply when a covered New Media Production is exhibited on pay television.  The applicable provisions of Article 13 shall apply when a covered New Media Production is exhibited on videocassettes or DVD's.

G.     **"Sunset" Clause**

The parties recognize that these provisions are being negotiated at a time when the business models and patterns of usage of productions in New Media are in the process of exploration, experimentation and innovation.  Therefore, the provisions of this Side Letter 12 shall expire on the termination date of the Television Agreement and will be of no force or effect thereafter.  No later than sixty (60) days before that expiration date, the parties will meet to negotiate new terms and conditions concerning productions made for New Media.

The parties further acknowledge that conditions in this area are changing rapidly and that the negotiation for the successor agreement will be based on the conditions that exist and reasonably can be forecast at that time.

**SIDE LETTER 13 – As of January 27, 2013**

**Re:  New Media Bargaining History**

The parties agree that they will be bound by the bargaining history between the Hollywood Guilds and Unions and the AMPTP with regard to interpretation of the language in Side Letter 11 ("Exhibition of Television Programs Transmitted Via New Media") and Side Letter 12 ("Productions Made for New Media") where the terms used are the same in these new media side letters and the new media side letters of those agreements.

**SIDE LETTER 14 – As of January 27, 2013**

**Re:  New Media Exhibition**

During the negotiation in 2012 of the AFM Television Videotape Agreement, the AFM and the Producers discussed the nature of distribution via new media.  In particular, the Producers compared new media to basic cable distribution.  The Producers stressed that a new media exhibitor might work with a third party in the same way that a cable network, such as FX, works with MSO's to exhibit programs.  The Federation acknowledged that it considers new media exhibitors such as hulu.com to be exhibitors, and not distributors, and that analogous situations to the one in basic cable would be treated the same – namely, that the third party would be considered an exhibitor and would not make the initial exhibitor a distributor.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

**SIDE LETTER 15 – As of January 27, 2013**

**Re:  Articles 5(A), 5(e), and 12(B)**

During the negotiation in 2012 concerning the AFM Television Videotape Agreement ("Agreement"), the parties discussed the meaning, application and enforceability of Articles 5(A), 5(E), and 12(B) of the Agreement (the "Articles"), and the Federation and the Networks each asserted their respective positions regarding rights to exploit product produced under the Agreement for any purposes other than those specifically addressed therein. In furtherance of their mutual desire to resolve the Agreement, and without prejudice to their respective positions concerning the meaning, application and enforceability of the Articles, the Federation and Networks agree to continue the Articles in the Agreement subject to the following conditions:

1.  Notwithstanding anything contained in the Articles, none of these provisions shall be construed to restrict or prohibit the Networks from using recordings made under the Agreement in emerging businesses other than New Media, which has been addressed in Side Letter 11, "Re: Exhibition of Television Programs Transmitted Via New Media."  Rather, in such circumstances, upon request by the Federation, the Networks agree to negotiate over terms and conditions applicable to the use of such recordings in connection with such emerging businesses, understanding that the stage of evolution of such businesses may impact such negotiations.

2.  Notwithstanding anything contained in the Articles, none of those provisions shall be construed to apply to Network TV Upfront presentations, promotional exhibitions for which the Network does not receive a licensing fee or any other payment for the exhibition, internal closed circuit exhibitions for which the Network does not receive a licensing fee or any other payment for the exhibition, film festivals for which the Network does not receive a licensing fee or any other payment for the exhibition, or any other presentations where the Network does not receive a licensing fee or any other payment for the exhibition.

3.  The Federation agrees to continue its historic practice prior to the negotiations leading to the Agreement expiring February 2, 2016, concerning the enforcement of these Articles; and

4.  This Side Letter applies to the Networks and shall be available to any producer of a Network program who signs the Agreement or a letter of adherence thereto.

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

## INDEX

### A

arrangers
    general rules · 34-35
    rates & credits · 38-39
assignment
    of agreement · 10
    of programs · 11
audition programs
    copies & lists · 9
    right to produce · 9

### B

bank acts · 26
basic cable · 11
basic rates
    arrangers, orchestrators, copyists · 34-40
    librarians · 39
    production musicians · 33
    recording instrumentalists, leaders, contractors · 17-21

### C

cancellation · 26
cartage · 23
cassettes · 11
clip use
    from programs · 3-4
    promotional trailers · 3
contractor, payment and functions of · 21-22
copyist
    general rules · 39-40
costuming · 25
covered musicians · 1

### E

electronic musical instruments · 31
excerpts
    use in programs · 3-4
    use in promotional trailers · 3

### F

facilities, use of · 10, 48
favored nations · 50

### Federation

    access to studio · 16
    approval required · 10-11
Film Musicians Secondary Markets Fund Agreement (Exhibit A) · 41-47
foreign language, domestic reuse in · 6
foreign use · 6-9

### H

health & safety · 16
health and welfare contributions · *See* payments
holidays · *See* payments–premium rates

### I

incomplete tracks · 32
Industry-Federation Committee · 16

### L

librarians · 1, 39
live music, use of · 2
live programs
    foreign use · 6

### M

magazine programs, use of music in · 31
makeup · 25
meal periods · 24
more favorable terms · 15
multiple parts · 24
music reports · 40
music sound consultant · 30

### N

needle drop (use of pre-recordings) · 25,33
New York, laws governing agreement · 47
news programs, use of music in · 31-32
non discrimination · 16
non-renewal of agreement, effect of · 1

### O

openings & closings · 29, 50
orchestrators

**Television Videotape Agreement**
**January 27, 2013 – February 2, 2016**

general rules · 39-40
rates · 34-36
transcriptions · 36
overdubbing · *See* multiple parts

## P

pay television · 11
payments
    arrangers · 34-36
    audition programs · 9
    basic rates–intrumentalists, leaders, contractors · 17-22
    basic rates–music preparation · 34-40
    basic rates–production musicians · 33
    cartage · 23
    contractor · 21-22
    doubling · 22
    excerpts (clips) · 3–4
    foreign use · 6-9
    health and welfare · 23, 40
    late penalties · 27-28
    librarians · 39
    makeup & costuming · 25
    meal periods · 24
    multiple parts (overdubbing) · 24
    music sound consultant · 30
    orchestrators · 34-36
    pension welfare funds · 4
    pickup & messenger services · 40
    premium rates · 24
    reuse · 4-6
    scoring non-musical game shows · 29
    scoring–daytime serials & strip game shows · 28-29
    supplemental markets · 11-15
    Theatrical & Motion Picture Television Special Payments Fund (SPF) · *See under* Special Payments Fund Agreement (SPF)
    theme music · 29
    wages–due dates · 4
pension fund (AFM EP Fund–U.S, AFM-EPW Fund–Canada), obligations to · 4
premium rates · *See* payments–premium rates

orchestrators & copyists · 40
production musicians · 1, 33
programs
    catalogs, copies & lists of · 9-10
promotional trailers, clip use · 3

## R

rehearsal
    advance notice · 26
    use of pre-recordings · 25
rest periods · 24
reuse · 4-6
run of show guarantee · 27

## S

scope of agreement · 1
scoring
    daytime serials & strip game shows · 28-29
    non-musical game shows · 29-30
simulcasts · 21
sound track regulations · 2-3
splitting of orchestra · 30
summer replacement programs · 20
supplemental markets · 11-16
    basic cable television · 11-12
    cassettes · 11-12
    pay television · 11-12
    pay type CATV · 11
    payments · 12-15

## T

termination of agreement · 2
theme music · 29-30

## U

union recognition · 1
union security · 1

MEMORANDUM OF AGREEMENT
EXTENDING THE AFM TELEVISION VIDEOTAPE AGREEMENT

This Memorandum of Agreement memorializes the understanding by between the American Federation of Musicians of the United States and Canada ("AFM") on the one side, and CBS Broadcasting, Inc. ("CBS), ABC, Inc. ("ABC"), and NBC, Inc. ("NBC") on the other side, extending the terms of the AFM Television Videotape Agreement in effect from January 27, 2013 through February 2, 2016 ("CBA").

1.    Term and Effective Date. By the terms of this Memorandum of Agreement, the term of the CBA shall continue and extend from February 2, 2016, until a new agreement is reached, or until one side provides thirty (30) days written notice to the other side of its intent to terminate.

2.    All Provisions Remain in Effect. In all respects, the provisions of the CBA shall remain in full force and effect without change.

**IN WITNESS WHEROF**, the undersigned duly authorized representatives enter into this Memorandum of Agreement Extending the AFM Television Videotape Agreement.

AMERCAN FEDERATION OF MUSICIANS
OF THE UNITED STATES AND CANADA

BY: _____

ITS: _____President_____

DATE: ___1 / 8 / 19_____

ABC, INC.

BY: _____

ITS: Executive Counsel Labor Rel.

DATE: 1 8 19_____

NBC, INC.

BY: _____

ITS: V.P. Labor Relations

DATE: 1 8 19_____

CBS, INC.

BY: _____

ITS: VP Labor Relations

DATE: 1-8-19_____

## MEMORANDUM OF UNDERSTANDING BETWEEN ABC, CBS AND NBC AND THE AMERICAN FEDERATION OF MUSICIANS

At the culmination of the current round of collective bargaining, The American Federation of Musicians of the United States and Canada ("the Federation") and the Producers (collectively "the parties") reached this Memorandum of Understanding ("MOU"), subject to the Federation's ratification procedure and with the understanding that the Federation's bargaining committee will unanimously recommend ratification, for a successor agreement to the 2013-2016 Television Videotape Agreement ("Agreement").

By the terms of this MOU, the Agreement shall be modified as set forth at pages 2-11 below.  Unless a later date is specified, all changes are effective upon notice of ratification.

By _____ Date ____11/30/2020____
ABC, Inc.

By _____ Date ____12/1/2020____
NBC, Inc.

By _____ Date ____11/30/2020____
CBS Broadcasting Inc.

AMERICAN FEDERATION OF MUSICIANS

By _____ Date ____11-30-2020____
Ray Hair, President

1. **Term**

   Three years from notice of ratification.

2. **Wages**

   Increase Basic Rates in Exhibits I, II and III: 2% effective the Sunday of the first payroll period following notice of ratification; 2% on the Sunday of the first payroll period following notice of ratification one year thereafter; 2% on the Sunday of the first payroll period following notice of ratification two years thereafter.

3. **Health**

   Amend the Health and Welfare contribution provisions in Exhibit I (E) and Exhibit III (E) to increase the daily rate by $5 from $25 to $30 effective the Sunday of the first payroll period following notice of ratification and by an additional $5 from $30 to $35 on the Sunday of the first payroll period following notice of ratification two years thereafter.

4. **Use of Excerpts ("Clips")**

   Modify Article 5(F)(2)(b)(i) as follows:

   It is also agreed that in those situations where excerpts are utilized of a musician(s) on a program who also renders musical services for such program, then that musician(s) shall not receive any payment for ~~the first~~ such excerpt(s). ~~(that musician(s) shall receive a payment based on the formula set forth above commencing with the second excerpt and each subsequent excerpt utilized).~~

5. **Strip Weekly "Best of" Show**

   Add the following new provision to Article 5(F)(2):

   "On a television program that is the fifth episode in the week of a four-day-per-week strip program, or the sixth episode in the week of a five-day-per-week strip program, and the fifth or sixth episode consists mainly of excerpts from that week's other episodes, musician(s) shall be paid, in lieu of all other compensation, a sum equal to the applicable minimum compensation for a fifth or sixth episode of the program, as applicable. The fifth or sixth episode shall be treated as a regular episode of the series, and will be subject to reuse fees as would any other episode."

6. **Reuse Payment Deadlines**

   Amend Article 8(A)(i) as follows:

   Upon a second or subsequent showing of any programs made during the term of this Agreement, in any market in the United States, its territories and possessions (including

Puerto Rico) and in Canada; the following percentages of the scale payment set forth in Exhibits I and II hereto, shall be paid within ~~fifteen (15) business~~ thirty (30) calendar days of such reuse to each Instrumentalist, Leader, Contractor and Music Sound Consultant who originally performed services in connection with such program (including, but not limited to, rehearsal services rendered prior to performance), except that for "off network" shows (shows in syndication that were originally on network), these payments will be due within ~~thirty (30) business~~ one hundred and twenty (120) calendar days of the airing, and for programs produced under Exhibit I, Paragraph Q (Scoring for Daytime Serials and Strip Game Shows) and Exhibit I, Paragraph S (Theme Music), these payments will be due within thirty (30) business days of the date of the airing unless the producer elects to use the optional payment formula under Exhibit I, Paragraph S, in which case these payments will be due within      twenty (20) business days of the date of the airing.

7. **First Run Syndication Replays**

Amend Article 8(A)(ii) as follows:

For replays of <u>any first run syndication programs or</u> any programs that occur between 2 a.m. and 6 a.m. in any market in the United States, its territories and possessions (including Puerto Rico) and in Canada a Special Replay Rate shall be established as follows:

[second unnumbered paragraph and table unchanged]

Any listed runs in this time period <u>or of first run syndication programs</u> will not be counted as "network runs."

Should any programs, <u>excluding first run syndication programs</u>, be otherwise repeated on the network outside this time period 2 a.m. – 6 a.m. (e.g., a repeat of "The Tonight Show" in its regular time period), the rerun obligations under Article 8(A)(i) will apply.

[last unnumbered paragraph unchanged]

8. **West Coast Replays of Award Programs**

Add the following new provision to Article 8(A):

"(v) In the event of a limited West Coast rerun of an awards program which has aired live and then is rerun beginning on the same day as the live broadcast, the residual payment shall be 33% of the applicable rerun fee."

9. **Foreign Use**

Modify Article 9(A) as follows:

[First unnumbered paragraph unchanged]

As used herein, except with respect to programs specified in Subparagraph (E)(i) below, the term "Foreign Residual Base" shall mean, with respect to each Instrumentalist, Leader, Contractor and Production Musician who performed services in connection with the program, the applicable scale set forth in Exhibits I and II hereof to a maximum of one hundred fifty percent (150%) of the applicable air rate plus guaranteed rehearsal for programs of sixty (60) minutes or less, and one hundred twenty-five percent (125%) of the applicable air rate plus guaranteed rehearsal for programs in excess of sixty (60) minutes.  With respect to each such program or series, <u>excluding award shows and sports programs,</u> the foreign use compensation percentage shall be determined under the <u>Distributor's Foreign Gross formula (Section (2) below),</u> ~~Foreign Area formula (Section (1) below)~~, unless the Producer elects to utilize the <u>Foreign Area formula (Section (1) below)</u> ~~Distributor's Foreign Gross formula (Section (2) below)~~, subject to the limitation stated in Subparagraph (E)(i) below.

(1)    <u>Foreign Area Formula</u>

<u>This formula (instead of the Distributor's Foreign Gross Formula set forth in Section (2) below) may be elected by the Producer for any such program or series except as otherwise provided in Subparagraph (E) of this Paragraph 9, provided that the Producer must give written notice of such election to the Federation prior to the first broadcast in any "Foreign Area," and such election shall be irrevocable as to that program or series.</u>  Under this formula, such percentage shall be:

[subparagraphs unchanged]

(2)    <u>Distributor's Foreign Gross Formula</u>

(a)    This formula <u>applies to any such program or series, excluding award shows and sports programs, unless the Producer timely elects the Foreign Area formula in Section (1) above and except as otherwise provided in Subparagraph (E) of this Paragraph 9.</u> ~~(instead of the Foreign Area Formula set forth in Section (1) above) may be elected by the Producer for any such program or series except as otherwise provided in Subparagraph (E) of this Paragraph 9, provided that the Producer must give written notice of such election to the Federation prior to the first broadcast in any "Foreign Area," and such election shall be irrevocable as to that program or series.~~  Under this formula, such percentage shall be:

[subparagraphs unchanged]

[Paragraphs B-E unchanged]

10. <u>**License to Secondary Digital Channels**</u>

Add new provision to Article 13(C) as follows:

"(6) For any license to a secondary digital channel of a free television or basic cable program, an aggregate sum equal to 2% of Distributor's gross receipts shall be paid to the American Federation of Musicians and Employers' Pension Fund. Such AFM-EPF contribution shall not constitute contributions on behalf of any particular individual."

11. <u>**No Discrimination**</u>

Amend Article 17 as follows:

The parties agree not to discriminate against any Musician because of race, sex, creed, color, national origin, ~~or~~ age, <u>sexual orientation, gender identity or disability</u>.

12. <u>**Cartage Fees**</u>

Amend Exhibit I, Paragraph D as follows:

| | |
|---|---|
| Harp, Electric Piano | ~~$30.00~~ <br> <u>$40.00</u> |
| Tympani (whole set), String-Bass, Tuba, Drums, Amplifiers, Baritone Saxophone, Bass Saxophone, Cello, Contra Bass Clarinet and Contra Bassoon | ~~$6.00~~ <br> <u>$10.00</u> each |

13. <u>**Late Payment Penalties**</u>

Modify Exhibit I, Paragraph P(e) and (f) as follows:

(e)   A penalty of twenty-five percent (25%) of the above mentioned amount due and unpaid (excluding the penalties in (a), (b), (c), and (d) above) if the delinquent payment is made between the 31st and 50th business days (excluding Saturdays, Sundays and holidays) after the payment was due. <u>Such twenty-five (25%) penalty payment shall not be required unless written notice has been given (which may not be given before the 31st day after the date of receipt of their completed billings and all necessary and completed W-4 forms) that the employer is delinquent and the employer has not made the payment within thirty (30) business days after receipt of such notice.</u>

(f)   Payments made after such fiftieth (50th) business day, <u>provided the written notice specified in (e) was received by an authorized representative of the Company,</u> shall require, in lieu of the said additional twenty-five percent (25%) payment, the payment of an additional amount equal to fifty-five percent (55%) of the initial amount payable, plus an additional ten percent (10%) payment for each thirty (30) days after the 50th day in which payment is not made. ~~Such fifty-five (55%) and ten percent (10%) payments shall not be required unless written notice has been given (which may not be given before the 31st day after the date of receipt of their completed billings and all~~

~~necessary and completed W-4 forms) that the employer is delinquent and the employer has not made the payment within fifteen (15) business days after receipt of such notice.~~

### 14. **Daytime Serials**

(a) Delete Exhibit I, Paragraph Q(1) "Annual Commitment" and Paragraph Q(2)(a) "Daytime Serials."

(b) The modifications in Sideletter 11, Paragraph 2 shall not apply to Daytime Serials and there shall be no payment for advertiser-supported streaming.

### 15. **Theme Music**

Amend Exhibit I Paragraph S(8)(b) as follows:

(b) A producer may elect upfront payments for subsequent 52-week cycles of ~~one hundred thirty-five percent (135%)~~ one hundred percent (100%) of scale, provided that such payment is made within twenty (20) business days of release.  If the producer fails to make the payment within that time limit, the producer will forfeit the right to utilize this optional formula, will also be subject to applicable late payment penalties, and will be entitled to a credit against any subsequent cycle payment for any overpayment made. Theme music in use for five or more consecutive 52-week cycles may be renewed thereafter at 75% of scale.

### 16. **Electronic Sell Through ("EST")**

Modify Paragraph 1(b) of Sideletter 11 as follows:

b.    Paid Permanent Downloads ("Download-to-Own" or "Electronic Sell Through") ("EST")

The following shall apply only to programs produced after the date of ratification:

If the consumer pays for an EST copy of a program, the Company shall pay ~~1%~~ 1.5% of 20% of "Distributor's gross," as that term is defined in Paragraph 9 below, for the first 100,000 units, and ~~1.9%~~ 2.9% of 20% thereafter.  Said amount shall be paid to the FMSMF.

### 17.  **Advertiser-Supported Streaming**

Replace Paragraph 2 of Sideletter 11 with the following new provision:

A.  Instrumentalists who perform live on a program or as the program is being recorded and those who provide music preparation services for such Instrumentalists shall receive payment for the streaming of television programs on a free to the consumer basis on advertiser-supported services transmitted via New Media, the production of

which commences on or after the date the 2020-2023 Television Videotape Agreement becomes effective, in accordance with the following:

(1) The Producer shall be entitled to a free "streaming window" for a seven (7) consecutive day period, except it shall be twenty-four (24) consecutive days for the first seven (7) episodes of a new series and any one time program; and seventeen (17) consecutive days for children's programming.

B. There shall also be a seven (7) consecutive day free streaming window surrounding each rerun on broadcast television of a program made for initial exhibition on broadcast television, for which free television residuals are payable. The seven (7) consecutive day period shall be measured separately for each city in the United States and Canada. If the program is rerun more than once in any seven (7) consecutive day period, the free streaming window shall nevertheless be limited to a single seven (7) consecutive day period surrounding one of the runs, which shall be determined by the Producer. During the streaming window, the Producer may make a television program available for streaming without payment for such use. The streaming window may be divided between the period immediately prior to and immediately following the initial exhibition of the program on television in any ratio determined by the Producer, except that for each episode of a series in its first year, the streaming window may commence up to thirty (30) days before the initial exhibition on television of the episode.

No payment is due, if during the free streaming period windows provided above, the Producer makes available a television program, production of which commences on or after the date the 2020-2023 Television Videotape Agreement becomes effective, for exhibition on a free-to-the consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed.

(1) If outside the streaming window, but within one (1) year of the expiration of the streaming window, the Producer makes available a television program, production of which commences on or after the date the 2020-2023 Television Videotape Agreement becomes effective, for exhibition on a free-to-the-consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television program is made available as described above following the expiration of the streaming window: two percent (2%) of the program fee applicable to the television program.

(2) If the Producer desires to make the television program available as described above for all or any part of the twenty-six (26) consecutive week period immediately following the twenty-six (26) consecutive week period described in the preceding

paragraph, but within one (1) year of the expiration of the streaming window, then the Producer shall make a residual payment in the following amount as consideration for a twenty-six (26) consecutive week period beginning on the first day that the television program is made available during such twenty-six (26) consecutive week period: two percent (2%) of the program fee applicable to the television program.

(3) Neither of the aforementioned twenty-six (26) week periods shall cover a period that is more than one (1) year after the expiration of the streaming window. In the event that a television program is made available as described above on a date that does not allow for the full twenty-six (26) consecutive week period of use within one (1) year of the expiration of the streaming window, then the payment for that period shall be prorated in weekly units to cover the shorter use period.

For example, suppose that the Producer streams a television program during the window and then does not stream the program again until thirty-nine (39) weeks after the expiration of the window period. Since only thirteen (13) weeks remain within the one (1) year period, a payment of one-half of the payment that would otherwise be due for the twenty-six (26) week streaming period would be payable for streaming during the thirteen (13) week period.

(4) During the streaming window, or during either of the twenty-six (26) consecutive week periods described in Paragraphs 2.B.(1) and (2) above, the Producer may allow excerpts of those television programs that are being made available to be used on free to the consumer, advertiser-supported services transmitted via New Media without any additional payment therefor.

(5) Upon expiration of the one (1) year period following expiration of the streaming window, if the Producer desires to make available a television program, production of which commences on or after the date the 2020-2023 Television Videotape Agreement becomes effective, for streaming on a free-to-the-consumer, advertiser-supported service transmitted via the internet or mobile or other device or on the advertiser-supported video-on-demand service ("AVOD") of a multichannel video programming distributor ("MVPD") or any similar service that currently exists or may hereafter be developed, then it shall pay residuals at the rate of one and two tenths percent (1.2%) of "Distributor's gross," as that term is defined in Paragraph 9 below.

## 18. <u>Virtual MVPD</u>

Add the following new provision to Sideletter 11:

During the course of the 2016 negotiations, the parties discussed how the landscape of the free television marketplace has evolved from the past – when the exhibition of a given television program was only available to the viewer in the home on a television set on a linear channel at a specific scheduled time – to the current marketplace, commonly referred

to as 'TV everywhere,' where the viewing public, in addition to viewing a program on a linear channel at a scheduled time, is also provided the time-shifted option to view the same program on a variety of digital devices on a video-on-demand ('VOD') basis. The bargaining parties agree that television exhibitions on a linear channel provided through an MVPD, whether such channel was a free broadcast channel or a basic cable channel, were considered exploitation of free television rights even though the consumer paid a monthly fee to access such programming.

Consistent with the above, the bargaining parties agree that with respect to new internet-delivered "virtual MVPD" services, such as Sling TV and Sony's PlayStation Vue, and other like services, such as CBS All Access, (collectively referred to hereafter as "vMVPD Services"), any VOD rights which are associated with exhibition of the program on a linear channel on the vMVPD Service (commonly referred to as "stacking rights") shall be considered exploitation of free television rights and not a form of pay or subscription television. Such "stacking rights" shall be treated the same as if such programs were exhibited on traditional MVPDs.

Under this framework, the parties clarified the treatment of covered television programs[1] on vMVPD Services as described below. It is understood that in order to qualify as an "vMVPD Service" under this Sideletter, such service must include at least one free television or basic cable linear channel that is non-exclusive to that service and is generally made available for exhibition on other traditional and/or virtual MVPD services.

1. When the License for Linear Channel Exhibition of the Covered Television Program or Series on the vMVPD Service Includes On-Demand Availability

    a. When a linear channel on an MVPD is also offered on a vMVPD Service (such as when ABC is offered on Sling TV), no additional payment is required for the linear channel availability on the vMVPD Service.

    b. When a covered television program is available on demand on the vMVPD Service pursuant to a license agreement with a channel or network that includes the right to exhibit the covered television program or other episodes of the same series on a linear channel on the vMVPD Service, the same free streaming windows and residual formulas that apply to the on-demand availability of a covered television program on an MVPD are applicable. (See Paragraph 2.A. and B. of this Sideletter.)

    c. The use of excerpts from a covered television program on the vMVPD Service pursuant to a license agreement with a channel or network that includes the right to exhibit the covered television program or other episodes of the same series on a linear channel on the vMVPD Service shall likewise be governed by the provisions of Paragraphs 2.B.(4) and 8 of this Sideletter.

---

1 It is understood by the parties that the provisions set forth herein apply to all television programs produced under this or any AFM Videotape Agreement, the principal photography of which commences on or after the date the 2020-2023 Television Videotape Agreement becomes effective.

d.   The fixed residual payment applicable under Paragraph 2.B. of this Sideletter covers on demand availability on a free-to-the-consumer, advertiser-supported new media service and on an MVPD (or any similar service that exists or may hereafter be developed) and vMVPD Service.

e.   The on-demand availability provisions under Paragraph 2.B. of this Sideletter apply regardless of whether there are advertisements.

f.   When the Producer directly licenses the right to exhibit a covered television program on a linear channel available only on a vMVPD Service(s), the supplemental exhibition on such channel, as well as any associated stacking rights and the use of excerpts, shall be treated in the same manner as a license of a free television program to basic cable.  The exhibition rights on the linear channel shall be subject to the applicable formula set forth in Article 13 for release to Basic Cable, and the stacking rights and use of excerpts shall be subject to the same free streaming windows and residual formulas that apply to the on-demand availability and use of excerpts of a covered television program pursuant to Paragraphs 2.A., 2.B., and 8 of this Sideletter.

2.   When the License Is for On-Demand Availability on the vMVPD Service

By contrast, when the Producer licenses the right to exhibit a covered television program, or one or more episodes of a covered television series, on an on-demand basis on the vMVPD Service, and such rights are not associated with the right to exhibit the program or episodes of the series on a linear channel on the vMVPD Service, the parties agree that Paragraph 1.A. of this Sideletter, which governs licenses to consumer pay new media platforms for a limited period or fixed number of exhibitions, shall apply. In addition, when a program is made exclusively for on-demand availability on a vMVPD Service, it shall be treated as having been made for a subscription consumer pay new media platform subject to the provisions of Sideletter 12 governing Programs Made for New Media.

## 19. **High Budget SVOD**

Add the following new provision to Sideletter 12:

High Budget Derivative and Original Dramatic New Media Productions Made for Initial Exhibition on a Subscription Video-On-Demand Consumer Pay Platform

(1)   "High Budget SVOD Programs" Defined

The Basic Rates in Exhibits I, II and III of this Agreement shall apply to Musicians employed on a "High Budget SVOD Program" which is defined as a dramatic Original or Derivative New Media Production made for initial exhibition on a subscription consumer pay New Media platform which meets the following criteria:

| Length of Program as Initially Exhibited* | "High Budget" Threshold |
|---|---|
| 20-35 Minutes | $1,000,000 and above |
| 36-65 Minutes | $2,500,000 and above |
| 66 Minutes or more | $3,000,000 and above |
| * Programs less than 20 minutes are not considered "high budget," regardless of their budgets. | |

(2) <u>Prospective Application</u>

The Basic Rates in Exhibits I, II and III of this Agreement shall be applicable prospectively only. They shall not apply to:

(a) any program or series that would otherwise qualify as a "High Budget SVOD Program" within the meaning of this Sideletter, for which the principal photography of the program, in the case of a one-time program, or the principal photography of the first episode, in the case of a series, commenced prior to the date the 2020-2023 Television Videotape Agreement becomes effective; or

(b) any program or series that would otherwise qualify as a "High Budget SVOD Program" within the meaning of this Sideletter for which the principal photography of the program or the first episode of the series commenced after the date the 2020-2023 Television Videotape Agreement becomes effective, if such program or series was produced pursuant to the terms of a bona fide license agreement with fixed and definite terms entered into by the Producer prior to the date the 2020-2023 Television Videotape Agreement becomes effective. However, if such license agreement is entered into subject to conditions precedent, then all such conditions must be satisfied prior to the date the 2020-2023 Television Videotape Agreement becomes effective.

**20. Drafting**

(a) Amend Article 7 (Pension Welfare Funds) to reflect that the contribution rate increased to 12.1% effective January 29, 2019 in accordance with the Pension Rehabilitation Plan.

(b) Any additional necessary conforming changes to reflect the terms of the MOU.